# EXHIBIT A
# PART 3 OF 12

NO. D-1-GN-12-003588

| | | |
|---|---|---|
| VERSATA SOFTWARE, INC., f/k/a | § | IN THE DISTRICT COURT |
| TRILOGY SOFTWARE, INC., and VERSATA | § | |
| DEVELOPMENT GROUP, INC., f/k/a | § | |
| TRILOGY DEVELOPMENT GROUP, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v | § | TRAVIS COUNTY, TEXAS |
| | § | |
| AMERIPRISE FINANCIAL, INC., | § | |
| AMERIPRISE FINANCIAL SERVICES, INC., | § | |
| AMERICAN ENTERPRISE INVESTMENT | § | |
| SERVICES, INC., | § | |
| | § | |
| Defendants. | § | 53rd JUDICIAL DISTRICT |

### THIRD PARTY MCCAMISH SYSTEMS, L.L.C.'S MOTION TO QUASH PLAINTIFFS' NOTICE OF INTENT TO TAKE CORPORATE REPRESENTATIVE DEPOSITION AND *SUBPOENA DUCES TECUM* AND MOTION FOR PROTECTIVE ORDER

TO THE HONORABLE COURT:

Third Party McCamish Systems, L.L.C. ("McCamish") hereby submits this Motion to Quash Plaintiffs Versata Software, Inc. and Versata Development Group, Inc. ("Plaintiffs" or "Versata")'s Notice of Intent to Take the Oral and Videotaped Deposition of the Corporate Representative of McCamish Systems and *Subpoena Duces Tecum*, and Motion for Protective Order, and respectfully show the Court as follows:

### SUMMARY

Versata seeks to depose a McCamish corporate representative on June 26, 2013, and to obtain documents in order to support its bid for a temporary injunction against Ameriprise. McCamish, which is not a party to this lawsuit, asks this Court to quash the deposition notice and subpoena, or alternatively to postpone the deposition to the week of July 8, 2013 or a mutually

convenient time thereafter.  McCamish also seeks an order narrowing the scope of Versata's deposition topics and document requests, as specified below.

## BACKGROUND

Plaintiff Versata offers a software program called Distribution Channel Management ("DCM"), which it markets to large companies in the financial services and insurance industries for the purpose of tracking and managing licenses, credentials, commissions, and compensation for financial advisors and sales agents.  Defendants Ameriprise Financial, Inc. *et al.* ("Ameriprise") provide a wide variety of investment services and financial products through a network of over 10,000 financial advisors.  Since 1999, Ameriprise has licensed the DCM software from Versata, and has gone to considerable effort and expense to improve and customize DCM to its own business needs and integrate it into the larger framework of Ameriprise's own Distribution Management Utility ("DMU"), an immense and complex system of in-house software applications supporting its nationwide operations.  At issue in this lawsuit is the 1999 Master License Agreement ("MLA") between Versata and Ameriprise, which governs Ameriprise's use of the DCM software.[1]  Section 4.8 of the MLA allows Ameriprise to use third-party contractors to perform maintenance and customization work on the DCM software so long as those contractors do not "compete with Versata in the development of enterprise compensation or configuration software."  Section 10.1 ambiguously prohibits the decompiling[2]

---

[1] In 1999, Ameriprise was known as American Express Financial Services or Amexco, and Versata was known as Trilogy.  For convenience, the parties are referred to by their current names.

[2] The "source code" for software programs such as Versata's DCM is composed by human programmers in languages such as Java.  The original source code must be "compiled" into a machine-readable form , incomprehensible to humans, before a computer can execute its instructions.  This machine code is called "object code."  A "decompiler" is a program, readily available on the internet, that converts object code back into source code so that a programmer can analyze it.  Versata provided its DCM software to Ameriprise in object code form.

of Versata's software code, except "to the extent any such activity may be permitted," without explaining when or under what circumstances decompiling is or is not permitted.

Ameriprise has preferred to use third-party contractors for the maintenance and customization work, rather than engaging Versata itself, because Versata was and is considerably more expensive than such contractors. From 2006 until very recently, Ameriprise engaged Infosys Technologies Limited (now Infosys Limited) ("Infosys") to provide DCM maintenance and customization. Versata was fully aware of Infosys's role from the beginning, and contracted with Ameriprise to provide training and support for Infosys's work. Versata made no objection to Infosys's presence prior to the middle of 2010. Versata's software was plagued by numerous bugs and defects, and Versata personnel were often slow to respond to requests for help. Infosys programmers sometimes found it necessary to decompile DCM files and examine their source code in order to solve problems and keep Ameriprise's systems running. Versata was aware of this decompiling since 2008, if not earlier, but made no objection or complaint prior to late 2010. In October 2010, Versata filed a lawsuit against Infosys alleging breach of contract and trade secret misappropriation based on the decompiling at Ameriprise. That action (the "federal lawsuit") is currently being litigated in the U.S. District Court for the Western District of Texas.

McCamish offers specialized software services and solutions for the insurance industry. McCamish's Producer Management and Compensation Services platform (PMACS) manages licenses and compensation for insurance sales agents. In November 2009, McCamish was acquired by Infosys BPO Limited, a subsidiary of Infosys Limited. Although McCamish developed the PMACS software long before its acquisition by Infosys BPO, Versata apparently believes that Infosys Limited has somehow used the decompiled DCM code to create PMACS as a means to compete against DCM. Despite this unsupported and incorrect belief, Versata has

made no move to compel discovery from McCamish or to seek any injunctive relief against Infosys in the more than two and a half years that the federal lawsuit has been underway.

Throughout 2011 and 2012, Versata repeatedly used the threat of litigation to pressure Ameriprise into removing Infosys and other third-party contractors from its DCM customization and maintenance work and signing up for vastly more expensive and inferior Versata services. In October 2012—more than two years after it complained about decompiling by Infosys, and at least two and a half years after it learned that an Infosys subsidiary had acquired McCamish, Versata filed this lawsuit against Ameriprise. Versata's allegations, in essence, are that the McCamish acquisition made Infosys a "competitor" of Versata, thus putting Ameriprise in breach of § 4.8 of the Master License Agreement; and that the decompiling by Infosys in 2010 and earlier (which Versata condoned at the time) put Ameriprise in breach of § 10.1 of the Agreement. Versata's application for injunctive relief is premised on a spectre of irreparable and immediate harm if Infosys is not barred from access to DCM. But Ameriprise has already phased out Infosys from the DCM customization work, and Infosys personnel no longer have any access to Versata DCM code at Ameriprise. Given this fact, given the lack of any evidence that any Versata confidential information passed to McCamish, and given Versata's lengthy delay in seeking discovery or injunctive relief in the federal lawsuit, there is no justification for forcing McCamish—which is not a party to either lawsuit—to provide overbroad and intrusive discovery on the accelerated schedule now demanded by Versata.

## ARGUMENT

### I.    VERSATA'S SUBPOENA ISSUED FROM THE WRONG COURT

McCamish Systems is a limited liability company organized under the laws of Georgia and headquartered at 6425 Powers Ferry Road, Atlanta, Georgia 30339. See Affidavit of Tommy Jacks at ¶ 4. McCamish has no facilities in Texas. *Id.* Because McCamish is a non-

party, its deposition must take place in the county where it resides and can only be ordered by a court with jurisdiction over that place. In this case, the subpoena should have issued from a Georgia court. *Latham v. Thornton*, 806 S.W.2d 347, 349–50 (Tex. App.—Fort Worth 1991, orig. proceeding); *see* Tex. R. Civ. P. 176.3; 201. Furthermore, under Rule 201.1 a party seeking to obtain deposition testimony from an out-of-state non-party witness must first ask the Texas court to issue letters rogatory, after notice and a hearing, requesting and authorizing the foreign court to subpoena the witness. Versata did not set a hearing, and did not ask this Court to issue letters rogatory to the Georgia court. Accordingly, Versata's deposition notice and subpoena are defective on their face and should be quashed.[3]

## II. THE TIME AND PLACE NOTICED FOR THE DEPOSITION IS INCONVENIENT AND OVERLY BURDENSOME

McCamish objects to the time and place of the deposition as inconvenient and overly burdensome. Tex. R. Civ. P. 192.6(a), 193.2(b). Versata is demanding that McCamish conduct a broad-ranging internal investigation, gather documents, designate and prepare a corporate representative witness, and produce that witness for deposition in Austin, Texas on June 26, 2013. As explained above, McCamish is headquartered in Atlanta, Georgia and any deposition should take place there rather than in Texas.

Furthermore, the limited notice given by Versata offers insufficient time for McCamish to prepare and respond. McCamish is not a party to this litigation, and is not a party to the federal lawsuit between Versata and Infosys. McCamish is two steps removed from the Infosys entity that worked with Versata's software at Ameriprise—a subsidiary of its subsidiary. Because McCamish's key personnel have had no involvement with Ameriprise or with the

---

[3] The undersigned attorney, Tommy Jacks, agreed to accept service for McCamish but reserved all objections to service except to agree that no objection would be based on the fact that the subpoena was delivered to him rather than directly to McCamish.

Versata lawsuits, and are unfamiliar with the relevant facts and issues, more time will be needed to prepare a knowledgeable corporate representative witness than would be the case for a typical deposition. Jacks Aff. ¶ 5. McCamish is currently attempting to identify a knowledgeable representative, but it does not yet know who that person will be, or whether that person could be available on June 26th. *Id.*

The deposition subject matter includes highly technical topics such as the features and functions of McCamish's software, and the similarities, if any, between that software and Versata's DCM software. Accordingly, the McCamish representative needs to be prepared for deposition and defended by an attorney who has both a strong technical background in software and computer science, and a thorough familiarity with the facts and issues of the Versata-Infosys and Versata-Ameriprise disputes. Jacks Aff. ¶ 6. The only attorneys who possess those qualifications are Roger Borovoy and David Barkan, who represent Infosys in the federal lawsuit. *Id.* ¶ 7. Both have decades of experience litigating software-related issues. *Id.* In addition, Mr. Barkan has already deposed Versata's chief technical witness and is thoroughly familiar with issues relating to Versata's DCM software. *Id.* However, both Mr. Borovoy and Mr. Barkan are out of the country during June, and cannot prepare or present a witness on June 26th. *Id.* They will return at the beginning of July, and McCamish will be able to present its witness no later than the week of July 8th, 2013. *Id.*

If the Court allows the deposition to go forward, McCamish respectfully asks the Court to delay it by only two weeks so that it can adequately prepare and present a knowledgeable witness. McCamish is willing to offer its corporate representative in Atlanta, Georgia during the week of July 8th, 2013, or at a later date to be mutually agreed.

### III.   VERSATA HAS HAD MORE THAN TWO YEARS TO OBTAIN THE DISCOVERY IT SEEKS

Versata insists that it cannot allow McCamish any extension of time to let it adequately prepare its witness—not even two weeks—simply because Versata does not wish to postpone the hearing, currently set for July 1, 2013, on its motion for a temporary injunction against Ameriprise. Versata has not offered any compelling reason why the injunction hearing cannot be reset, or indeed why it needs discovery from McCamish, who is not a party to this lawsuit and has no relationship with Ameriprise, in advance of that hearing. Versata's sudden sense of urgency is hard to understand. Versata's federal lawsuit against Infosys has been underway for more than two and a half years, and during that time Versata has had every opportunity to obtain the discovery it now seeks from McCamish, but it has made no serious effort to do so. Versata has never asked for a McCamish deposition or moved to compel any discovery or set a hearing on any of Infosys's objections concerning discovery related to McCamish in the federal lawsuit. Jacks Aff. ¶ 8.

Versata's allegations regarding McCamish are twofold:  that the acquisition of McCamish made Infosys a "competitor" of Versata, thus purportedly violating a provision in Versata's contract with Ameriprise; and that Infosys supposedly misappropriated Versata DCM code from Ameriprise and then used it to develop a competing product at McCamish. Since Versata has been making both these allegations for years, there is no excuse for its long delay in seeking discovery to test the truth of those allegations. Infosys's subsidiary Infosys BPO acquired McCamish in November 2009, and Versata knew about the acquisition and began expressing concern in internal discussions about Infosys as a possible "competitor" at least as early as March 2010. Jacks Aff. ¶ 7. However, not until *September 2012* did Versata formally notify Ameriprise that it considered Ameriprise's employment of Infosys to be a breach of its contract. *Id.*

Versata's allegation that its DCM code somehow ended up at McCamish is founded on nothing more than the impression of Versata's CEO Chris Smith, upon browsing McCamish's public website, that some of the advertised features of McCamish's PMACS software seemed similar to features of Versata's DCM software. Ex. "B", corporate representative deposition testimony of Chris Smith, Aug. 31, 2011, at 94:11–97:4. In July 2011, Smith verified Versata's First Amended Complaint, which stated that McCamish did not begin offering these features until after Infosys allegedly misappropriated Versata DCM code at Ameriprise. Ex. "B" at 57:21–58:11; *see* Ex. "C", First Amended Complaint § 18. In fact, however, archived versions of the same McCamish web pages that Versata investigated show that as far back as 2006, years before Infosys's subsidiary acquired it, McCamish was advertising exactly the same features of PMACS in exactly identical language.[4] In November 2012, more than a year after his first deposition, Smith gave a second deposition in which he admitted that he had conducted no further investigation of McCamish and was not aware if anyone else at Versata had done so. *See* Ex. "D", deposition testimony of Chris Smith, Nov. 2, 2012, at 277:16–279:8. Had Versata made any further effort to substantiate its allegations, it would have learned that they were without foundation. *No* Infosys employees who previously worked on DCM at Ameriprise have gone on to work at McCamish, and both Infosys and McCamish have taken measures to ensure that no such movement of employees will take place in future. Jacks Aff. ¶¶ 15, 16. Thus, there is no plausible pathway by which Versata DCM code could have found its way from Ameriprise to McCamish.

---

[4] *See* Ex. "E", showing the current version of the PMACS web page as retrieved on June 4, 2013, and also the archived version of same page dated October 15, 2006, which is readily available from the Internet Archive (or "Wayback Machine") at http://archive.org/web/web.php. Given that the current and archived pages are plainly identical, it is difficult to credit Smith's testimony that he used the "Wayback Machine" to determine that McCamish did *not* offer these features before Infosys acquired it. Ex. "B", Smith Depo. 58:22–59:8.

Given Versata's inexplicable lack of diligence in pursuing discovery from McCamish in the federal lawsuit—where it would be somewhat more relevant than it is in this suit, since McCamish has no connection to either Versata or Ameriprise other than indirectly through Infosys—this Court should not allow Versata to make McCamish jump at its command.

## IV.   THE DISCOVERY SOUGHT BY VERSATA IS OVERLY BROAD AND UNDULY BURDENSOME

McCamish objects to both the deposition topics and document requests as overly broad and unduly burdensome. *See* Tex. R. Civ. P. 192.4. Versata's allegations to date have focused on McCamish's PMACS software platform, which manages licenses and compensation for insurance sales agents and offers some features similar to Versata's DCM product. But Versata's discovery requests are far more sweeping, seeking information about all "enterprise software," a vague and unclear category (Topic 2); or "configuration software," which refers to a different line of Versata software products entirely unrelated to DCM,[5] and never in use at Ameriprise (Topic 4, RFP 3); or all "McCamish systems products" (RFP 1). For the first time, Versata seeks information about a separate McCamish product, VPAS Life, which is used not for compensating insurance agents but for designing and selling insurance policies, and as such has nothing in common with Versata's DCM software. *See* Ex. "F".[6] Such sweeping discovery is overly broad and goes far beyond the limits of relevance. Furthermore, Versata's demand that McCamish produce documents identifying "every individual who has contributed to the development" of *any* McCamish products since the Infosys BPO acquisition in late 2009 (RFP 1)

---

[5] Versata's Configuration Modeling Language (CML) software is used to configure physical components and options when ordering the manufacture or purchase of complex products such as aircraft, automobiles or computer systems. *See* U.S. Pat. No. 5,515,524 (May 7, 1996). McCamish, which specializes in serving the insurance industry, has no remotely similar products.

[6] As with PMACS, the McCamish public web page describing the features of VPAS Life has not changed since long before McCamish's acquisition by Infosys BPO in late 2009. Exhibit "F" shows the current VPAS Life page, as retrieved on June 4, 2013, and also an archived version obtained from http://archive.org/web/web.php showing the same page as it appeared on February 6, 2007.

is grossly excessive and unduly burdensome, given that such a list is likely to contain many hundreds if not thousands of names.

If the Court allows Versata to obtain any discovery from McCamish, it should limit the scope of that discovery to what can be rationally related to the facts at issue. Versata's discovery should be limited to the relationship between Infosys and McCamish; the PMACS software; and the possible movement of personnel between the Infosys Ameriprise team and McCamish. Specifically, Versata's corporate deposition topics should be limited to the following:

     (a) The corporate relationship between Infosys and McCamish;

     (b) The role of Infosys personnel, if any, in the development of the PMACS software;

     (c) The features, functionality, and markets for the PMACS software; and

     (d) Knowledge of the documents produced in response to the subpoena.

Likewise, Versata's document requests should be limited to the following:

     (a) Document(s) sufficient to identify Infosys personnel, if any, who have worked on McCamish's PMACS software after previously working on Versata's DCM software;

     (b) Any Versata code including but not limited to DCM code;

     (c) Document(s) sufficient to show McCamish's efforts to sell its PMACS software, including the customers or markets targeted for sales;

     (d) Document(s) sufficient to show the features and functionalities of the PMACS software.

## V. THE DISCOVERY SOUGHT BY VERSATA IS IRRELEVANT AND UNNECESSARY FOR PURPOSES OF THE TEMPORARY INJUNCTION HEARING

McCamish also objects to both the deposition topics and document requests as irrelevant and unnecessary, particularly for purposes of the upcoming temporary injunction hearing. McCamish has no connection to the dispute between Versata and Ameriprise except through Infosys, its corporate grandparent. In response to unrelenting threats and pressure from Versata, Ameriprise has now removed all Infosys personnel from its DCM customization and maintenance work, and has revoked their login credentials so that Infosys employees no longer have access to the DCM software code. Jacks Aff. ¶¶ 17, 18. After more than two years of discovery in the federal lawsuit, there is no evidence that Infosys personnel decompiled any Versata code at Ameriprise more recently than July 2010, and there is no evidence that Infosys personnel *ever* decompiled any Versata code outside of Ameriprise, or used decompiled code from Ameriprise anywhere other than at Ameriprise. Jacks Aff. ¶ 14. Whatever Infosys may or may not have done at Ameriprise is now a matter of history, relevant to liability and damages in a trial on the merits, but not a basis for a temporary injunction whose purpose is simply to preserve the status quo. *See Janus Films, Inc. v. City of Fort Worth*, 358 S.W.2d 589, 589 (Tex. 1962).

Discovery into McCamish's markets and customers is unlikely to produce evidence on issues of significance to this litigation. Even if McCamish could be characterized as a "competitor" of Versata within the meaning of Section 4.8 of the Versata-Ameriprise agreement, that does not establish Infosys—the entity Ameriprise actually hired—as such. Nothing in the language of § 4.8 suggests an intent to apply a doctrine of corporate veil piercing that would extend its reach to subsidiaries of subsidiaries. In any event, Ameriprise's removal of Infosys from DCM work renders this issue moot for purposes of injunctive relief.

If Versata is truly concerned about the decompiling of its software—and is not just using decompiling as a pretext to coerce Ameriprise to sign up for its overpriced services—then Versata should be seeking an injunction against Infosys, not against Ameriprise. But in its federal lawsuit, which Versata filed against Infosys more than two and a half years ago, Versata has never moved for injunctive relief. Versata clearly feels no sense of urgency in the federal action, since it recently agreed to postpone trial of that action to May 2014. Jacks Aff. ¶ 13. Versata's long delay in seeking relief is fatal to its case for a preliminary injunction, because it puts the lie to any argument that it will suffer immediate or irreparable harm without it. *See Landry's Seafood Inn & Oyster Bar – Kemah, Inc. v. Wiggins*, 919 S.W.2d 924, 928 (Tex. App.—Houston [14th Dist.] 1996, no writ) (temporary injunction denied where movant waited eight months to seek relief). Likewise, Versata's long delay in pursuing its allegations against McCamish should prevent it from compelling accelerated discovery in service of its bid for an injunction to which it is not entitled.

## CONCLUSION

For the reasons stated above, McCamish respectfully requests that the Court quash Versata's deposition notice and subpoena, or alternatively that the Court enter a protective order limiting the scope of discovery as follows:

(1)   McCamish will produce a corporate representative witness in Atlanta, Georgia during the week of July 8th, 2013, or at a time and place mutually agreed;

(2)   The scope of corporate representative testimony is narrowed as follows:

(a) The corporate relationship between Infosys and McCamish;

(b) The role of Infosys personnel, if any, in the development of the PMACS software;

(c) The features, functionality, and markets for the PMACS software; and

(d) Knowledge of the documents produced in response to the subpoena.

(3)    The scope of the document requests is narrowed as follows:

(a) Document(s) sufficient to identify Infosys personnel, if any, who have worked on McCamish's PMACS software at McCamish after previously working on Versata's DCM software;

(b) Any Versata code including but not limited to DCM code;

(c) Document(s) sufficient to show McCamish's efforts to sell its PMACS software, including the customers or markets targeted for sales;

(d) Document(s) sufficient to show the features and functionalities of the PMACS software.

Respectfully submitted this 5th day of June, 2013.

FISH & RICHARDSON P.C.

By:  */s/ William Tommy Jacks*
    William Tommy Jacks
    Texas Bar No. 10452000
    FISH & RICHARDSON P.C.
    One Congress Plaza, Suite 810
    111 Congress Avenue
    Austin, Texas 78701
    (512) 472-5070 (Telephone)
    (512) 320-8935 (Facsimile)
    jacks@fr.com

    John Michael Gaddis
    Texas Bar No. 24069747
    FISH & RICHARDSON P.C.
    1717 Main Street, Suite 5000
    Dallas, Texas 75201
    (214) 747-5070 (Telephone)
    (214) 747-2091 (Facsimile)
    gaddis@fr.com

    David M. Barkan
    Roger S. Borovoy
    FISH & RICHARDSON P.C.
    500 Arguello Street, Suite 500
    Redwood City, CA 94063
    (650) 839-5070 (Telephone)
    (650) 839-5071 (Facsimile)
    barkan@fr.com
    borovoy@fr.com

    ***Attorneys for Third Party Witness***
    MCCAMISH SYSTEMS, L.L.C.

## CERTIFICATE OF CONFERENCE

I hereby certify that I contacted counsel for Plaintiffs to discuss the merits of this motion and that they are in opposition to the relief sought in this motion.

*/s/ William Tommy Jacks*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on June 5, 2013, to all counsel of record in the manner indicated below, pursuant to Rule 21a of the Texas Rules of Civil Procedure.

### VIA ELECTRONIC MAIL
### AND U.S. MAIL

Patton G. Lochridge
Travis C. Barton
McGinnis Lochridge & Kilgore, L.L.P.
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000
(512) 495-6093 fax
plochridge@mcginnislaw.com
tcbarton@mcginnislaw.com

Demetrios Anaipakos
Steven Mitby
Ahmad, Zavitsanos & Anaipakos, P.C.
3460 One Houston Center
1221 McKinney
Houston, Texas 77010
(713) 655-1101
(713) 655-0062 fax

*Attorneys for Plaintiffs*
Versata Software, Inc.,
f/k/a Trilogy Software, Inc., and
Versata Development Group, Inc.,
f/k/a Trilogy Development Group, Inc.

Steve McConnico
smcconnico@scottdoug.com
Christopher D. Sileo
csileo@scottdoug.com
Scott, Douglass & McConnico, LLP
600 Congress Avenue, Suite 1500
Austin, Texas 78701
(512) 495-6300
(512) 474-0731 fax

Peter M. Lancaster
Heather D. Redmond
Dorsey & Whitney LLP
Suite 1500, 50 South Sixth Street
Minneapolis, Minnesota 55402-1498
(612) 340-2600
lancaster.peter@dorsey.com
redmond.heather@dorsey.com

*Attorneys for Defendants*
Ameriprise Financial, Inc., Ameriprise
Financial Services, Inc., and American
Enterprise Investment Services, Inc.

*/s/ William Tommy Jacks*

# EXHIBIT
# A

STATE OF TEXAS
TO ANY SHERIFF OR CONSTABLE OF THE STATE OF TEXAS OR OTHER
PERSON AUTHORIZED TO SERVE SUBPOENAS AS PROVIDED IN RULE 176.5
T.R.C.P.

### CAUSE NO. D-1-GN-12-003588

| | | |
|---|---|---|
| **VERSATA SOFTWARE, INC., F/K/A**<br>**TRILOGY SOFTWARE, INC.; and**<br>**VERSATA DEVELOPMENT GROUP,**<br>**INC.,  F/K/A TRILOGY DEVELOPMENT**<br>**GROUP, INC.** | §<br>§<br>§<br>§<br>§<br>§ | **IN THE DISTRICT COURT** |
| **Plaintiffs,**<br>**v.** | §<br>§<br>§ | **OF TRAVIS COUNTY, TEXAS** |
| **AMERIPRISE FINANCIAL, INC.,**<br>**AMERIPRISE FINANCIAL SERVICES,**<br>**INC., AMERICAN ENTERPRISE**<br>**INVESTMENT SERVICES, INC.** | §<br>§<br>§<br>§<br>§ | |
| **Defendants.** | § | **53rd JUDICIAL DISTRICT** |

YOU ARE HEREBY COMMANDED TO SUBPOENA & SUMMON:

**CORPORATE REPRESENTATIVE OF**
**MCCAMISH SYSTEMS BY AND THROUGH THEIR ATTORNEYS**
William Tommy Jacks, Fish & Richardson, 111 Congress, Suite 810, Austin, Texas
78701; David M. Barkan and Roger S. Borovoy, Fish & Richardson P.C., 500 Arguello St., Suite
500, Redwood City, CA 94063; and John Michael Gaddis, Martha Deacon Jones, Scott Cashion
Thomas, and Thomas H. Reger , II, Fish & Richardson P.C., 1717 Main Street, Suite 5000,
Dallas, TX 75201.

To appear before a certified court reporter of Henjum Goucher, for a deposition to be held at **the**
**offices of FISH & RICHARDSON, P.C., 111 CONGRESS AVENUE, SUITE 810, AUSTIN, TX 78701,**
**on June 26, 2013, at 9:00 a.m.,** to testify as a witness and to produce the documents as
requested in the attached Notice of Intention to Take the Oral and Videotaped Deposition of the
Corporate Representative of McCamish Systems and Subpoena Duces Tecum in the above styled
Civil Action to attend from day to day until lawfully discharged. **This subpoena is issued in**
**accordance to Rule 176, TRCP.**

DO NOT FAIL to return this writ to the 53rd Judicial District Court of Travis County, TX with
either the attached officer's return showing the manner of execution or the witness's signed
memorandum showing that the witness accepted the subpoena.

## DUTIES OF PERSON SERVED WITH SUBPOENA

You are advised that under Texas Rule of Civil Procedure 176, a person served with a subpoena has certain rights and obligations.  Rule 176.6 provides:

(a)    *Compliance required.*  Except as provided in this subdivision, a person served with a subpoena must comply with the command stated therein unless discharged by the court or by the party summoning such witness.

(b)    *Organizations.*  If a subpoena commanding testimony is directed to a corporation, partnership, association, governmental agency, or other organization, and the matters on which examination is requested are described with reasonable particularity, the organization must designate one or more persons to testify on its behalf as to matters known or reasonably available to the organization.

(c)    *Production of documents or tangible things.*  A person commanded to produce documents or tangible things need not appear in person at the time and place of production unless the person is also commanded to attend and give testimony, either in the same subpoena or a separate one.  A person must produce documents are they are kept in the usual course of business or must organize and label them to correspond with the categories in the demand.  A person may withhold material or information claimed to be privileged but must comply with Rule 193.3.  A nonparty's production of a document authenticates the document for use against the nonparty to the same extent as a party's production of a document is authenticated for use against the party under Rule 193.7.

(d)    *Objections.*  A person commanded to produce and permit inspection and copying of designated documents and things may serve on the party requesting issuance of the subpoena – before the time specified for compliance – written objections to producing any or all of the designated materials.  A person need not comply with the part of a subpoena to which objection is made as provided in this paragraph unless ordered to do so by the court.  The party requesting the subpoena may move for such an order at any time after an objection is made.

(e)    *Protective orders.*  A person commanded to appear at a deposition, hearing, or trial, or to produce and permit inspection and copy of designated documents and things may move for a protective order under Rule 192.6(b) – before the time specified for compliance – either in the court in which the action is pending or in a district court in the county where the subpoena was served.  The person must serve the motion on all parties in accordance with Rule 21a.  A person need not comply with the part of the subpoena from which protection is sought under this paragraph unless ordered to do so by the court.  The party requesting the subpoena may seek such an order at any time after the motion for protection is filed.

(f)    *Trial subpoenas.*  A person commanded to attend and give testimony, or to produce documents or things, at a hearing or trial, may object or move for protective order before the court at the time and place specified for compliance, rather than paragraphs (c) and (d).

(Rule 176.8a Contempt); Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

PLEASE SEE ATTACHED SUBPOENA DUCES TECUM.

> **Requested by: Benjamin Foster**
> State Bar No. 24080898
> **AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING, P.C.**
> 1221 McKinney, Suite 3460
> Houston, TX 77010
>
> Attorney for Plaintiff

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 28th day of May 2013.

3

## OFFICER'S RETURN

Came to hand the ____ day of May, 2013, at ____ o'clock _____ a.m./p.m. and executed by delivering a copy of this Subpoena to the within-named _____ in person at _____, in _____ County, Texas, on the ____ day of May, 2013 at ____ o'clock _____ a.m./p.m., and tendered to the witness a fee of $10.00 in cash.

BY: _____
Person who is not a party to the suit, and is not less than 18 years of age

**I hereby accept service of the attached subpoena and will comply as directed in the subpoena. Per Rule 176.5 T.R.C.P.**

_____          _____          $_____
**Witness**                                       **Date**                  **Fee**

Not executed as to the witness for the following reasons: _____

_____

_____

_____

_____

4

**EXHIBIT A**

**CAUSE NO. D-1-GN-12-003588**

| | | |
|---|---|---|
| VERSATA SOFTWARE, INC., F/K/A | § | IN THE DISTRICT COURT |
| TRILOGY SOFTWARE, INC.; and | § | |
| VERSATA DEVELOPMENT GROUP, | § | |
| INC.,  F/K/A TRILOGY DEVELOPMENT | § | |
| GROUP, INC. | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| AMERIPRISE FINANCIAL, INC., | § | |
| AMERIPRISE FINANCIAL SERVICES, | § | |
| INC., AMERICAN ENTERPRISE | § | |
| INVESTMENT SERVICES, INC. | § | 53rd JUDICIAL DISTRICT |
| | § | |
| Defendants. | § | |

---

**NOTICE OF INTENTION TO TAKE THE ORAL AND
VIDEOTAPED DEPOSITION OF THE
CORPORATE REPRESENTATIVE OF MCCAMISH SYSTEMS AND
SUBPOENA DUCES TECUM**

---

To:    McCamish Systems, by and through their counsel of record, William Tommy
       Jacks, Fish & Richardson, 111 Congress, Suite 810, Austin, Texas 78701; David
       M. Barkan and Roger S. Borovoy, Fish & Richardson P.C., 500 Arguello St.,
       Suite 500, Redwood City, CA 94063; and John Michael Gaddis, Martha Deacon
       Jones, Scott Cashion Thomas, and Thomas H. Reger , II, Fish & Richardson P.C.,
       1717 Main Street, Suite 5000, Dallas, TX 75201.

Please take notice that, under Texas Rule of Civil Procedure 199.2, Plaintiffs Versata

Software, Inc., f/k/a Trilogy Software, Inc., and Versata Development Group, Inc., f/k/a Trilogy

Development, Inc. (collectively, "Versata") will take the oral and videotaped deposition of the

Corporate Representative of McCasmish Systems beginning at 9:00 a.m. on Wednesday, June

26, 2013, at the offices of FISH & RICHARDSON, P.C., 111 CONGRESS AVENUE, SUITE 810,

AUSTIN, TX 78701.

Please take further notice that the Corporate Representative will provide testimony on the subjects attached as Exhibit 1 and the witness is asked to bring with him documents listed on the Subpoena Duces Tecum, attached as Exhibit 2.

Henjum Goucher will stenographically record the deposition, which will also be videotaped. The deposition will continue from day to day until completed.

Respectfully submitted,

AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING, P.C.

Demetrios Anaipakos
State Bar No. 00793258
Amir Alavi
State Bar No. 00793239
Steven J. Mitby
State Bar No. 27037123
Benjamin F. Foster
State Bar No. 24080898
1221 McKinney Street, Suite 3460
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062

McGINNIS, LOCHRIDGE & KILGORE, L.L.P.

Travis Barton
State Bar No. 00790276
600 Congress Avenue, Suite 2100
Austin, Texas 78701
Telephone: (512) 495-6000
Facsimile: (512) 495-6093
ATTORNEYS FOR PLAINTIFFS

2

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served upon the following counsel of record via certified mail, return receipt requested and/or via facsimile and/or via hand-delivery on May 29, 2013:

William Tommy Jacks
Fish & Richardson
111 Congress, Suite 810
Austin, Texas 78701

David M. Barkan
Roger S. Borovoy
Fish & Richardson P.C.
500 Arguello St., Suite 500
Redwood City, CA 94063

John Michael Gaddis
Martha Deacon Jones
Scott Cashion Thomas
Thomas H. Reger , II
Fish & Richardson P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201.

Peter M. Lancaster
Heather D. Redmond
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota  55402-1498
(612) 340-2868 (Facsimile)
lancaster.peter@dorsey.com
redmond.heather@dorsey.com

Steve McConnico
Christopher D. Silco
Scott, Douglass & McConnico, LLP
600 Congress Avenue, Suite 1500
Austin, Texas 78701
(512) 474-0731 (Facsimile)
smcconnico@scottdoug.com
csileo@scottdoug.com

Travis Barton
McGinnis, Lochridge & Kilgore, LLP
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000 (Telephone)
(512) 495-6093 (Facsimile)
tcbarton@mcginnislaw.com

Benjamin F. Foster

## EXHIBIT 1

## SUBJECTS FOR WHICH CORPORATE REPRESENTATIVE
## TESTIMONY IS SOUGHT FROM PLAINTIFFS

1. The ownership and management of McCamish Systems including but not limited to Infosys's acquisition of McCamish Systems and the role Infosys has in the daily management of McCamish.
2. McCamish's development of Enterprise software. Including where and how the development is performed.
3. McCamish's PMACS and VPAS systems, including its features, functionality and markets in which McCamish markets PMACS and VPAS.
4. Other enterprise compensation or configuration software McCamish develops or sells and the markets in which it is sold.
5. Knowledge of the Documents produced in response to attached Subpoena Duces Tecum.

## EXHIBIT 2 – SUBPOENA DUCES TECUM

## DEFINITIONS AND INSTRUCTIONS

1. The term "You" or "Yours" refers to McCamish Systems as well as its agents, employees, partners, affiliated entities, parents, and subsidiaries.

2. The terms "Plaintiffs" refers to "Versata" means Versata Software, Inc., f/k/a Trilogy Software, Inc., and Versata Development Group, Inc., f/k/a Trilogy Development Group, Inc.; any parents, subsidiaries, or affiliates of Versata Software, Inc., f/k/a Trilogy Software, Inc., and Versata Development Group, Inc., f/k/a Trilogy Development Group, Inc.; and any employees, agents, contractors, or lawyers.

3. The terms "Defendants" refers to Ameriprise Financial, Inc., Ameriprise Financial Services, Inc., and American Enterprise Investment Services, Inc., and any employees, agents, contractors, or lawyers.

4. The terms "Infosys" refers to and means Infosys Technologies, Ltd.; any parents, subsidiaries, or affiliates of Infosys Technologies, Ltd.; and any employees, agents, contractors, or lawyers.

5. The terms "document" and "documents" are to be construed broadly and as defined in TEXAS RULE OF CIVIL PROCEDURE 192.3(b), including but not limited to originals, non-identical copies, and electronically stored information, including but not limited to emails, web pages, temporary files, and downloaded files.

6. The terms "communication" and "correspondence" refers to any contact whatsoever and any transmission or exchange of words, numbers, graphic material, or other information, either orally, electronically, or in writing, whether made, received, or participated in, and includes but is not limited to, any conversation, correspondence, letter, note, memorandum, inter-office or intra-office correspondence, telephone call, telegraph, telegram, telex, telecopy, facsimile, e-mail, text message, internet communication, telefax, cable, electronic message, audio or video recording, discussion, face-to-face meeting, or conference of any kind, whether in person, by audio, video, telephone, or any other form.

7. The terms "and" and "or" shall be construed either disjunctively or conjunctively whenever appropriate in order to bring within the scope of these Requests information or documents which might otherwise be considered to be beyond their scope.

8. The singular form of a word shall be interpreted as plural and the plural form of a word shall be interpreted as singular whenever appropriate in order to bring within the scope of these Requests any information which might otherwise be considered to be beyond their scope.

6

9. All documents withheld on a claim of privilege must be preserved.  If any documents are so withheld, you shall identify in a privilege list or log each such document by the following information:

    (1) The name, address, and title of all author(s);
    (2) The name, address, and title of all addressee(s);
    (3) Each person to whom copies were sent or distributed, and any other person to whom such document or its contents were disclosed in any manner whatsoever (whether in writing, verbally, or otherwise);
    (4) The date and subject matter of the document;
    (5) The current location of the document; and
    (6) A complete statement of the basis on which the privilege is claimed.

10. Under Texas Rule of Civil Procedure 196.4, you are requested to produce any information or documents responsive to these requests that is maintained in electronic or magnetic form in an accessible manner similar to the way it is maintained in the ordinary course of business.  If a document is maintained in both hard copy and electronic or magnetic formats, you should produce both the hard copy and electronic or magnetic format.  If documents are produced in their native format (.doc, .xls, .pdf, etc.) please also produce a static image (.tiff) file of each document with a corresponding Bates label.

11. <u>Manner of Production.</u>   The documents produced in response to this Request For Production of Documents shall be segregated and clearly marked or labeled as to the specific request to which such documents are responsive and being produced.  Otherwise, such documents shall be produced as they are kept in the usual course of business, including the production of the files from which such documents are taken.  Electronic data produced in response to this request should be produced in native format or in TIFF, PDF, or another form that preserves and reflects any metadata, formatting, or other information associated with the documents in its native format.  If documents, such as electronic mail, are produced, they must be produced in a form so that the relationship between related electronic documents (e.g. email attachments) is preserved and reflected in the production.

## DOCUMENTS REQUESTED

1. A document or documents sufficient to identify every individual who has contributed to the development of McCamish systems products since Infosys's acquisition of McCamish Systems.
2. Any and all Versata source code including but not limited to DCM source code.
3. A Document or documents sufficient to show McCamish's current efforts to sell enterprise compensation or configuration software. This include a document or documents sufficient to show what customers or markets McCamish is targeting for sales.
4. A Document or documents sufficient to show the features and functionalities of PMACS and VPAS.

# EXHIBIT
# B

49

1    concern first; was it that Infosys had purchased
2    McCamish and thereby in Versata's view became a
3    competitor, or was it the support issue that led -- that
4    led to a concern about misuse of confidential
5    information?
6        A.  I actually think we look at them as two
7    separate issues, you know, potentially independent of
8    each other.
9        Q.  Do you recall which you became aware of first?
10       A.  I would imagine it would have been the issue
11   with the support call, but I can't say with a hundred
12   percent certainty.
13       MR. BARKAN:  Can we off the record for a
14   minute?
15       THE VIDEOGRAPHER:  We are going off the
16   record.  The time is 10:32.
17       (Recess.)
18       THE VIDEOGRAPHER:  We are back on the
19   record.  The time is 10:33.
20       MR. BARKAN:  We'll go ahead and mark as
21   Defendant's Exhibit 2 a copy of the Amended Complaint
22   and Verified Application for Injunctive Relief.
23       (Exhibit 2 marked for identification.)
24       MR. BARKAN:  And to identify this on the
25   record, this is the amended complaint filed by Versata

50

1    on July 22nd, 2011.
2        Q.  (By Mr. Barkan) Mr. Smith, please take a few
3    moments to review the complaint.  There are a number of
4    attachments to it.  My first group of questions to you
5    will be specifically with regard to paragraph 18, so you
6    may want to read that area first.
7        A.  (Reading documents.)  So I've read section 18.
8    I don't know if you want me to read the whole thing or
9    just take it one at a time.
10       Q.  Did you have a chance to review the amended
11   complaint to prepare for today's deposition?
12       A.  I've -- I've read the complaint, yes.
13       Q.  If you would turn to paragraph 18, please.
14       A.  Okay.
15       Q.  In paragraph 18, the second sentence starts off
16   with the allegation that McCamish Systems is a
17   competitor of Versata.  Do you see that?
18       A.  I do.
19       Q.  And why does Versata consider McCamish to be a
20   competitor?
21       A.  Well, as it says here, I mean, they offer
22   products and services that are, in our view, directly
23   related to the compensation management offering that we
24   have.
25       Q.  Are you aware of any customers who at one time

51

1    used Versata's offering but then switched to McCamish?
2        A.  We do not know of those yet, but I'm sure, as
3    part of our discovery, we're trying to understand what
4    has happened.
5        Q.  Are you aware of any customers where Versata
6    and McCamish both bid for the same customer work,
7    irrespective of ended up getting the work?
8        A.  Typically don't know who we're up against at a
9    site, so not that I'm aware of today.
10       Q.  Now, does Versata consider McCamish to be a
11   competitor specifically in the space where you had
12   indicated Versata might get two or three new contracts a
13   year?
14       A.  It's certainly possible, yes.
15       Q.  And have -- have you seen -- let me withdraw
16   that.
17       Are you aware of anyone at Versata being
18   familiar with the McCamish compensation product
19   specifically?
20       A.  I think the information that we have is -- is
21   currently what we found that's readily available from
22   their website and other public documents.
23       Q.  Do you know anyone who has used both products,
24   both the Versata product and the McCamish product?
25       A.  Anyone under what context?

52

1        Q.  Any Versata employee.
2        A.  I'm not aware of any Versata employee that's
3    used both systems.
4        Q.  How about any Versata contractor?
5        A.  I'm currently not aware of any of them as well.
6        Q.  Has Versata prepared any kind of comparison of
7    the strengths and weaknesses of the Versata offering
8    versus McCamish's?
9        A.  No.  We typically don't spend a lot of time
10   doing competitor analysis.  Given the space we play in
11   and who we target, we try to focus on our product and
12   the fact that it is -- has feature rich as well as
13   scales exponentially on performance, and that's usually
14   what ends up winning out in the end for customers in our
15   space.  We don't spend any money on marketing either.
16       Q.  In getting feedback from your customers, are
17   you aware of any situations where a customer has said to
18   Versata that McCamish had a particular feature and they
19   wished Versata had the same feature?
20       A.  For our -- our current customers?
21       Q.  Yeah, your current customers.
22       A.  No.  Our customers are usually quite happy with
23   our technology and want to talk to us about how we can
24   make it better.  But I'm not aware of any customer
25   saying, "I wish you did something more like your

***CONFIDENTIAL - ATTORNEYS' EYES ONLY***
CHRISTOPHER SMITH - August 31, 2011

14 (Pages 53 to 56)

53

1    competitor."
2    Q.  Okay.  And would the same hold true for a
3    situation which Versata had bid on the work but didn't
4    get the work, was there feedback from the customer
5    saying, "Well, gee, we wish you had feature X or Y that
6    McCamish has"?
7    A.  Now, when you're -- when you're playing at --
8    at that high end, you don't typically get anything other
9    than you didn't make it to the next round.
10   Q.  Okay.  Let me have you focus in again on
11   paragraph 18, and we were looking at the second
12   sentence.  Let me read the whole thing in the record,
13   and then I'll have questions on one part of it.
14   "McCamish Systems is a competitor of Versata that offers
15   software products and services relating to compensation
16   management that perform or incorporate some of the same
17   functions performed by the Versata software files that
18   were decompiled and copied by Infosys."
19       So Mr. Smith, let me ask you first:
20   There's a reference here to functions performed by the
21   Versata software files that were decompiled and copied
22   by Infosys.  What functions are being referred to in
23   paragraph 18?
24   A.  Well, those would be the ones that we filed in
25   our complaint, so the four components, one of which

54

1    would could be the validators.
2    Q.  Now, when the complaint alleges that the -- or
3    references functions performed by Versata Software files
4    that we decompiled and copied by Infosys, is Versata
5    referring to the function of validation generally or
6    something more specific?
7    A.  I'm not sure I understand the question.
8    Q.  Well, perhaps if we look back at the specific
9    files that are -- that are mentioned here.  You might
10   look, for example, starting at paragraph 12.
11   A.  I'm sorry.  What page are you on?
12   Q.  Pages 4 to 5.  It starts at the bottom of
13   page 4.  There's an allegation in paragraph 12 that one
14   of the files that was allegedly decompiled was called
15   FSTeamValidator.Java.  Do you see that?
16   A.  I do.
17   Q.  So then when we go back to paragraph 18, is
18   FSTeamValidator.Java one of the software files that is
19   the basis for the allegation in paragraph 18?
20   A.  We believe it could be.
21   Q.  And when paragraph 18 refers to the same
22   functions, what are the functions of
23   FSTeamValidator.java that would be the basis for the
24   allegation in paragraph 18?
25       MR. BARTON:  And I object to that question

55

1    because it calls for information outside the scope of
2    the topics that Mr. Smith has been designated on.  We
3    intend to designate another corporate rep to talk about
4    those very issues.
5        MR. BARKAN:  It's pretty close to topics 8
6    and 9, but I understand your objection.
7        Q.  (By Mr. Barkan) If you can answer.  If not,
8    we'll have another witness answer that.
9        A.  Yeah, I can't -- I can't get into, you know,
10   the details of what each of these four components listed
11   above, I think in section 12, relate to.  But, you know,
12   I can say that there are a lot of similarities, just
13   based off the public information, between the two
14   products.
15       Q.  And what are the similarities that you have in
16   mind?
17       A.  Well, I'm -- I'm looking at it from just, I
18   guess, a high level marketing perspective, which is,
19   they are marketing a product that sounds very similar,
20   if not exactly, like our own, including using things
21   like hierarchies and trees to calculate compensation.
22       Q.  Do you undertake to determine when Versata --
23   I'm sorry.  Let me withdraw that.
24       What other similarities do you have in
25   mind besides the one you just mentioned with respect to

56

1    hierarchies and trees?
2        A.  Well, just the overall function of paying
3    compensation for brokers, agents, and other commissioned
4    parties.
5        Q.  Now, is it Versata's position that anyone
6    offering a product for paying compensation for brokers
7    and other parties must necessarily be using a Versata
8    trade secret?
9        A.  No, I wouldn't necessarily say that.  There are
10   lots of companies that sell compensation software.
11       Q.  And how about with respect to hierarchies and
12   trees, is it Versata's position that anyone offering a
13   compensation product with hierarchies and trees would
14   necessarily be using a Versata trade secret?
15       A.  I guess it would depend on how they are using
16   it.
17       Q.  And what do you mean by a hierarchy or a tree
18   in that context?
19       A.  Well, one of the key components of our software
20   is, we're able to have, I'll say, an unlimited number of
21   hierarchies that show up in essentially a tree view.
22   You can have a hierarchy of commissioned parties, which
23   can be a person, a group, a collection of people that
24   are somehow eligible for some form of commission payout,
25   and then you have another hierarchy for the actual

***CONFIDENTIAL - ATTORNEYS' EYES ONLY***
CHRISTOPHER SMITH - August 31, 2011

15 (Pages 57 to 60)

57

1  compensation plan itself. And so the way we do that
2  with our hierarchies is a pretty unique way of how we
3  categorize them, so that you can then inter-use those
4  trees together to dynamically calculate the correct
5  compensation for any level within that -- that tree
6  structure.
7      Q.  From the information you were able to find on
8  the McCamish website with respect to hierarchies and
9  trees at McCamish, what did you find was similar and
10  what did you find was different?
11      A.  Well, it's not like you can do an in-depth
12  analysis off of just the website. It's a lot of
13  marketing material. So I guess what I can say is, it
14  sounds very similar and it's targeted towards the same
15  space and the same problem that our DCM offering has
16  targeted.
17      Q.  Did you do any investigation to determine when
18  hierarchies and trees were first introduced into
19  McCamish's compensation product?
20      A.  I -- I have -- I have no way to do that.
21      Q.  Okay. The last sentence in paragraph 18 says,
22  "McCamish did not begin to market or offer to its
23  customers software products and services relating to the
24  code or functionality found in the Versata software
25  files until after Infosys had wrongly decompiled and

58

1  copied Versata's software files." Now, what was the
2  basis for that allegation as of July of 2011?
3      A.  Well, it's our belief, based off the
4  information that we have been able to find readily
5  available.
6      Q.  And the readily-available information includes
7  the McCamish website?
8      A.  McCamish website.
9      Q.  Anything else?
10      A.  Other publicly-accessible information that you
11  can Google.
12      Q.  Now, specifically with the allegation that
13  McCamish did not begin to market or offer to its
14  customers software products and services relating to the
15  code and functionality found in the Versata software
16  files, what information did Versata have that would have
17  informed it as to when McCamish began -- began to offer
18  these features?
19      A.  Again, that's just based off of what we've --
20  we've been able to find from their marketing material
21  that's readily available.
22      Q.  Did you attempt to find any older marketing
23  material to see if it had changed?
24      A.  We have tried to do that, yes.
25      Q.  And what steps did you take to try to do that?

59

1      A.  Essentially a series of Google searches. There
2  is also a technology called the Wayback Machine where
3  you can usually look at previous versions of websites.
4  So piecing all of that together, it -- that's how we
5  framed this up.
6      Q.  Wayback Machine is sometimes called
7  Archive.org?
8      A.  It might be.
9      Q.  And besides hierarchy and trees and overall
10  having a compensation system for brokers and others,
11  what other features did you find in your investigation
12  of publicly-available information about McCamish that
13  formed the basis for the allegations in paragraph 18?
14      A.  Well, just that their marketing material is
15  very similar to the overall offering within our DCM
16  application, covering compensation management,
17  credentials, validation, policy admin, et cetera.
18      Q.  And in making the allegation that McCamish did
19  not begin to market or offer to its customers software
20  products and services relating to the code or
21  functionality found in the Versata software files until
22  after Infosys had wrongly decompiled and copied
23  software. Versata software files, what date did you use
24  as the cut-off period for before versus after?
25      A.  Well, I can't say with a hundred percent

60

1  certainty today, but I would imagine it would be
2  somewhere in the 2008, 2009 time frame.
3      Q.  Other than counsel, who did the investigation
4  related to determining any similarities that McCamish is
5  offering?
6      A.  I believe that would have been limited to
7  myself and Mr. Strayhorn.
8      Q.  Did Versata view McCamish as a competitor prior
9  to Infosys purchasing McCamish?
10      A.  Well, I think we would consider all companies
11  that provide compensation solutions targeted towards
12  the, you know, the life insurance, health insurance
13  industry as being competitors to our technology, yes.
14      Q.  And was McCamish a company that Versata was
15  specifically aware of as being in that space prior to
16  being bought by Infosys?
17      A.  I wouldn't say they were necessarily well
18  known, no.
19      Q.  Can you place in time when was the first time
20  you ever heard any mention of McCamish at Versata?
21      A.  I cannot at this time, no.
22      Q.  Do you recall having heard that name prior to
23  2009?
24      A.  It's possible, but I can't say for sure. Like
25  I said, we don't spend lot of time analyzing our

***CONFIDENTIAL - ATTORNEYS' EYES ONLY***
CHRISTOPHER SMITH - August 31, 2011

16 (Pages 61 to 64)

---

**61**

1  competitors.  We focus on our customers and what they
2  need, and that helps us get a — a lot of business.
3      Q.  Let's switch to a different topic now.  What
4  steps does Versata take to protect its trade secrets?
5      A.  We do a lot to protect our trade secrets.  We
6  protect them with infrastructure, of course with
7  contracts, with our customers, third parties, employees
8  and contractors.  Obviously, we have our code of conduct
9  document that we feel also protects our — our
10 technology.
11     Q.  Anything else come to mind?
12     A.  Well, that's a lot right there.  Like I said,
13 we protect the access to it, so not a lot of people have
14 access to it.
15     Q.  Now, you mentioned infrastructure.  What do you
16 mean by infrastructure?
17     A.  It would be the physical servers where our
18 source code is stored or any of our confidential or
19 trade secrets would be kept.
20     Q.  And how is the access limited?
21     A.  Well, there's multiple levels, but essentially
22 it's multi-level protected with user names and
23 passwords.
24     Q.  And what individuals are issued user names and
25 passwords?

---

**62**

1      A.  Only -- only I'll say only entities that --
2  that have the need to know how -- the need to know that
3  information.
4      Q.  And is there a name internally that Versata
5  uses to -- for its code repository?
6      A.  There is.  That is called -- I believe it's
7  called VBS, Versata Build System.
8      Q.  And what is VBS?
9      A.  It's a source control and build repository.
10 It's an automated set of technologies.
11     Q.  Was that created by Versata or is it built on
12 top of a commercial product?
13     A.  It's built by Versata, built on a lot of open
14 source technology.
15     Q.  And where is the -- where are the physical
16 servers located for VBS?
17     A.  They are actually in the Cloud at Amazon,
18 secured by Amazon's security guard.  They're a SAS 70
19 facility.
20     Q.  Beyond the security provided by Amazon, does
21 Versata add any additional security of its own?
22     A.  We do, yes.  To the -- to the servers and to
23 the automated processes that allow someone access.
24     Q.  What kind of security does Versata have?
25     A.  Again, it would be user name, password-type

---

**63**

1  security.
2      Q.  Does Versata do any additional encryption on
3  the files before they are transmitted to the Cloud?
4      A.  That I do not know.  It's quite possible.
5      Q.  Who at Versata would know that?
6      A.  That would most likely be Rahul Subramanian,
7  the general manager of gDev.
8      Q.  Is he responsible for the overall management of
9  VBS?
10     A.  Well, because they do all of our development,
11 he would be responsible for who gets access to that,
12 yes.
13     Q.  At any given time, about how many individuals
14 have user names and passwords for VBS?
15     A.  They would be difficult to say.  But I'd say
16 there's probably a -- this would be a complete guess,
17 but it would typically be around 50 to a hundred.
18     Q.  And for those individuals given access, once
19 they have a user name and password, do they have access
20 to the full VBS or just portions of it?
21     A.  Oh, just portions of it, only for that specific
22 task to which they're going to perform.
23     Q.  And that access control is part of the features
24 built into the VBS system itself?
25     A.  That's correct.

---

**64**

1      Q.  Now, how does Versata deploy its software at
2  customer sites, and specifically with respect to keeping
3  it secure at a customer site?
4      A.  So I want to make sure I understand the
5  question.  So when someone like Ameriprise licenses our
6  software, how does -- how does the software get
7  installed?
8      Q.  Yes.
9      A.  Okay.  So the -- the licensed software will
10 actually get installed by one of our consultants.  They
11 have an installation that is either on a CD or they
12 download from our secure FTP site to that facility.
13 That is a runtime-only installation, and so it has the
14 compiled object code of our product, not the source
15 code.  That object code is installed per our installer.
16 Once the installer is done running, it cleans up after
17 itself, and the installation is deleted, and the
18 customer is ready to use it as it out of the box, which
19 never happens, or engages us with professional services
20 to enhances to do whatever it is they need it to do.
21     Q.  Now, you mentioned compiled object code.  What
22 do you mean by that?
23     A.  So our product is written in Java, for the most
24 part.  In fact, DCM might be exclusively written in
25 Java.  There's a set Java source files.  Again, I'm not

---

### 93

1  site at Ameriprise have any strict rules about never
2  sharing source code for a core file with anyone from
3  Infosys under any circumstance?
4      A.  Well, it would -- it would depend on the
5  situation.  I would -- I would say that Ameriprise's
6  contract clearly would allow a scenario for that to
7  happen, as long as we were there and it's for a specific
8  purpose, and after the fact that that is treated as
9  confidential information not to be used again.
10     Q.  So in that situation, the Infosys employee
11 would be able to use it just for the specific purpose
12 that Versata has reviewed, and then when that's done,
13 they don't ever need to access -- they won't ever access
14 that again?  That's a --
15     A.  We'd have to authorize it, yes, then that would
16 be for a specific point on the behalf of Ameriprise
17 under the terms of -- of their agreement.
18     Q.  Are you aware of any instances where that has
19 occurred at Ameriprise, where a Versata employee or
20 contractor has provided source code for a core file to
21 someone from Infosys?
22     A.  Not that I'm aware of.  That's not to say that
23 I'm aware of all those instances, because it -- it could
24 happen without me needing to know about it.  Again, it
25 depends on what is the issue at Ameriprise.  They're one

### 94

1  of financial services' largest customers.  They're one
2  of our company's largest customers.  Their contract
3  certainly would allow us to share that information under
4  the terms of the contract if it was the only way to
5  resolve a particular issue.
6      Q.  Who at Versata would you expect to be
7  knowledgeable about specific examples of when that
8  scenario has arisen?
9      A.  Well, outside of myself, I'd say Leela Kaza.
10 It's very rare.
11     Q.  Now, if we could go back to the complaint.  It
12 should be Exhibit 2 there.
13     A.  I have it here, yes.
14     Q.  Let me ask you to review paragraph 18 again
15 just to orient yourself.
16     A.  (Reading documents.)  Okay.
17     Q.  Now, earlier today, I asked you some questions
18 about the last sentence in that paragraph where it
19 states, "McCamish did not begin to market or offer to
20 its customers software products and services relating to
21 the code or functionality found in the Versata software
22 files until after Infosys had wrongly decompiled and
23 copied Versata's software files."  Do you recall
24 testifying that one of the bases for that allegation was
25 research you had done on the Wayback Machine?

### 95

1      A.  Uh-huh.  I do.
2      Q.  And that one of the bases for that statement
3  was information that you saw on the McCamish Web page?
4      A.  I said it was McCamish Web page, as well as
5  other Google searches that we had performed, yes, or
6  that I had performed.
7          MR. BARKAN:  Let me go ahead and mark as
8  Defendant's Exhibit 4 a printout from the McCamish
9  website that we did over the lunch break, of a page
10 that's entitled "McCamish Systems and Infosys Company,"
11 and then the -- the lead bullet is, "Highly Functional,
12 User-friendly Interface," and this is a portion of the
13 PMACS description on the Website.  This will be
14 Exhibit 4.
15         (Exhibit 4 marked for identification.)
16     Q.  (By Mr. Barkan) Mr. Smith, take as much time as
17 you need to review Exhibit 4.  And my first question
18 will be simply whether this appears to be similar to the
19 Web page you reviewed that you indicated was a basis for
20 the allegations in paragraph 18.
21     A.  This looks like it's potentially one of the
22 pages I reviewed, yes.
23     Q.  Now, earlier today, you indicated that on the
24 McCamish website there were -- was a description of a
25 McCamish product that you felt indicated to you that

### 96

1  McCamish had added functionality similar to what Versata
2  offers.  Would you review the Web page that's Exhibit 4
3  and circle for me any portions of the description of the
4  Web page that you feel provide that information?
5          MR. BARTON:  Objection, form.
6      Q.  (By Mr. Barkan) I have a pen if you don't have
7  one there.
8      A.  I have one.  (Witness marking document.)  Could
9  I circle the whole thing; would that be easier?
10     Q.  If you feel the whole thing is applicable, that
11 would be all right as well.
12     A.  (Witness marking document.)  Okay.
13     Q.  And can you identify for the record the
14 portions that you circled?
15     A.  You know, I'll try to do the best I can.  So I
16 circled Producer Services box, the Insurance Services
17 box, the paragraph that starts, "At the base of a
18 successful," and ends with "compensation
19 relationships."  All three diamond bullets above "Sales
20 Force Management," and the entire Sales Force
21 Management.  Those would be things that are very, very
22 similar to our own product.
23     Q.  And do those items form the basis for Versata's
24 allegation in paragraph 18 that McCamish marketed to its
25 customers software products and services that related to

***CONFIDENTIAL - ATTORNEYS' EYES ONLY***
CHRISTOPHER SMITH - August 31, 2011

25 (Pages 97 to 100)

**97**

1  the code of functionality found in the Versata software
2  files?
3      A.  That would be correct, yes.  Would not be the
4  only thing we looked it.
5      MR. BARKAN:  Let's mark as Exhibit 5
6  another version of this same Web page.  This was printed
7  from the Wayback Machine, and the date, according to the
8  Wayback Machine, is January 20th, 2010.  And we picked
9  this page because it's the closest archived version of
10  the website to the date of the amended complaint.  This
11  will be Defendant's Exhibit 5.
12      (Exhibit 5 marked for identification.)
13      Q.  (By Mr. Barkan)  And Mr. Smith, Exhibit 5
14  appears to us to be either identical or nearly identical
15  to Exhibit 4, but if you would take a moment to review
16  Exhibit 5 and tell me if there is anything on Exhibit 5,
17  in addition to or different than Exhibit 4, that you
18  feel indicates that McCamish has marketing functionality
19  similar to the Versata software files, please do so.
20      A.  I mean, these two look similar.
21      Q.  Okay.  Fair enough.
22      MR. BARTON:  Mr. Barkan, may I ask a
23  question on the record?
24      MR. BARKAN:  Sure.
25      MR. BARTON:  Do you believe that document,

**98**

1  Exhibit 5, is a version that existed on January of 2010
2  or January of 2011?
3      MR. BARKAN:  To the best of our knowledge,
4  January 2010, I think, is what it says on there.
5      MR. BARTON:  Okay.
6      MR. BARKAN:  There's a bar at the top of
7  the document that has the -- the date on it.
8      MR. BARTON:  Thank you.
9      MR. BARKAN:  Let's mark as Defendant's
10  Exhibit 6, I believe this is from Versata's production,
11  although I don't see production numbers on it.  This was
12  printed from the native documents, so I will describe it
13  as the -- the title along the top -- top of the page.
14  It says, "Running DCM Under a Debugger, DCM Customer
15  Wiki, page 1 of 5," and there are indeed five pages
16  here.  There's also a -- a website address here, but
17  that's likely an internal address.  So this will be
18  Exhibit 6.
19      (Exhibit 6 marked for identification.)
20      MR. BARTON:  Let me state on the record
21  that with respect to Defendant's Exhibit 6, it's my
22  understanding that this document was produced on media
23  which was prominently marked as "Attorneys Eyes Only,"
24  so I believe Defendant's Exhibit 6 is an attorneys eyes
25  only document.

**99**

1      MR. BARKAN:  Okay.  And why don't we go
2  ahead and write that at the top of the witness's copy so
3  that --
4      THE WITNESS:  I'm sorry.  I didn't hear.
5      MR. BARTON:  Put "AEO," capital A, capital
6  E and capital O, please, sir, on that.
7      THE WITNESS:  (Witness marking document.)
8      MR. BARTON:  Thank you.
9      Q.  (By Mr. Barkan)  Mr. Smith, please take a few
10  minutes to review Exhibit 6 and tell me if you recognize
11  it?
12      A.  (Viewing documents.)  Okay.
13      Q.  What is Exhibit 6?
14      A.  It looks like it's an -- a document that is in
15  a -- what's called a customer Wiki.  Customers that are
16  active and paying maintenance support would have access
17  to online documents that would assist them in
18  understanding more about our technology and/or resolving
19  problems.  This specific document is describing how to
20  run DCM in debugger mode.
21      Q.  And is this customer Wiki hosted locally at the
22  customer or essentially with Versata?
23      A.  It would be with Versata.  It's posted in the
24  Cloud.
25      Q.  And is access to this controlled or secured in

**100**

1  some way?
2      A.  It would be controlled through, I believe, the
3  support system that would be user name and password
4  based on customer maintenance agreements.
5      Q.  Okay.  Now, in the upper right-hand corner,
6  there is a line that starts at the left with, "Google
7  sites running DCM under debugger," and then it says,
8  "Versata updated 20 hours ago."  Do you see that?
9      A.  I do.
10      Q.  What does updated 20 hours ago indicate?
11      A.  Well, this is a site that's based off of Wiki,
12  and so it's an active online site where, as things get
13  added, changed, you know, or, you know, there's --
14  there's something done to the site, it -- the site
15  itself actually keeps track of when the last change was.
16      Q.  And who is able to make changes to the website?
17      A.  On this website, I believe it's limited to the
18  product manager, Chris Strayhorn, and a handful of other
19  folks that work with the product.
20      Q.  Does Versata maintain a record of the changes
21  to the website?
22      A.  To the Wiki?
23      Q.  On the Wiki, yeah.  I'm sorry.  Yes.
24      A.  The Wiki itself might actually do that.  This
25  is actually a Google site, posted with Google.  So most

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **VERSATA SOFTWARE, INC.,** | § | |
| **f/k/a TRILOGY SOFTWARE INC. and** | § | |
| **VERSATA DEVELOPMENT GROUP, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | **Case No. 1:10-cv-00792 SS** |
| | § | |
| **v.** | § | |
| | § | |
| **INFOSYS TECHNOLOGIES LTD.,** | § | |
| | § | |
| **Defendant.** | § | |

**AMENDED COMPLAINT AND**
**VERIFIED APPLICATION FOR INJUNCTIVE RELIEF**

Versata Software, Inc. and Versata Development Group, Inc., (together "Versata") files this Amended Complaint and Verified Application for Injunctive Relief against Infosys Technologies, Ltd. ("Infosys"); in support, Versata would respectfully show the Court the following:

**I.**
**PARTIES**

1.      Versata, formerly known as Trilogy Software, Inc., and Versata Development Group, Inc. are Delaware corporations whose principal places of business are in Austin, Texas.

2.      Infosys is an Indian corporation whose principal place of business is Plot No. 44 & 97A, Electronics City, Hosur Road, Bangalore India, 560 100.  Infosys has appeared in this action.

**II.**
**JURISDICTION**

3.      The court has personal jurisdiction over Infosys because it engages in business in this district and throughout Texas.  In addition, this Court has subject matter jurisdiction over this action because the damages sought by Versata are within the jurisdictional limits of the

Court. The court also has jurisdiction over this action because Defendant has appeared in this action and elected not to contest jurisdiction.

## III.
## VENUE

4.      In accordance with 28 U.S.C. § 1391, venue is proper in the Austin Division of the Western District of Texas because a substantial part of the events giving rise to Versata's claims arose in such district and Defendant was subject to personal jurisdiction in such district at the time this action was commenced. Venue is also proper in this district because Defendant has appeared in this action and elected not to contest venue.

## IV.
## FACTS

5.      Versata is a leading provider of e-business software to businesses throughout the United States. Infosys is a software company that is a direct competitor with Versata.

6.      Ameriprise Financial, Inc. ("Ameriprise") is a Versata customer. Versata provides software licensing, development, and support and maintenance services to Ameriprise pursuant to various software consulting, development, and maintenance agreements. In the course of providing these services to Ameriprise, Versata conveyed to Ameriprise software information that is confidential to Versata and that qualifies as a Versata trade secret. This confidential software information includes Versata's proprietary Distribution Channel Management ("DCM") software product in both source code and object code form. Versata ensures the secrecy of this confidential information by maintaining the information is a secure format and by not disclosing the confidential software information to third parties without the protection of confidentiality and nondisclosure restrictions.

7.      Infosys provides software development and maintenance services for companies

2

around the world.  Versata and Infosys have entered into various license, consulting, and non-disclosure agreements providing Infosys with limited access to certain Versata confidential information pursuant to license agreements.  None of these agreements, however, permit Infosys to decompile or reverse engineer Versata's source code.  In particular, Section 4.10 of the December 10, 2003 Consultant Agreement between Versata and Infosys provides that Infosys shall not perform any work that would utilize Versata's confidential information.  See **Exhibit A**. Section 2 of the August 27, 2001 Confidentiality and Nondisclosure Agreement between Infosys and Versata provides that Infosys cannot use Versata's confidential information for its own benefit.  See **Exhibit B**.  Section 3 of the Confidentiality and Nondisclosure Agreement also specifically prohibits Infosys from reverse engineering or decompiling Versata's software. **Id.**

8.      In September of 2003, Versata and Infosys entered into a Technology License Agreement.  This Agreement permits Infosys to use Versata's confidential technology for limited purposes and only with respect to providing services to certain "Approved Entities" as defined in the Agreement.   Ameriprise was never designated as an "Approved Entity" under the Technology License Agreement.

9.      The Technology License Agreement sets forth several express restrictions on Infosys's use of Versata's technology.  The Agreement specifies that Infosys' access to and use of Versata's technology is limited to that which is reasonably necessary for Infosys to perform work for qualifying Approved Entities, work for which Infosys is obligated to pay Versata a royalty.  See **Exhibit C, § 2(j)**.  The Agreement states in Section 2(m) that Versata's source code may be accessed by Infosys only at business locations for Versata, Infosys, or an Approved Entity under the Agreement.  **Id.**  Section 3(a) of the Technology License Agreement states that any use of Versata's technology for any purpose other than CML programming or training shall

3

be an infringement of Versata's intellectual property rights and shall constitute a material breach of the Agreement.  See **Exhibit C, § 3(a)**.  Section 5(c) of the Technology License Agreement further provides that even after expiration of the Agreement, Infosys shall not perform any competitive work that would utilize Versata's technology.  **Id. at § 5(c)**.  And, Section 5(d) of the Agreement requires Infosys to maintain and enforce written confidentiality agreements with each of its employees who utilize Versata's confidential technology.  **Id. at §§ 5(d) and 8(g)**.

10.    In addition to the above restrictions, Section 8 of the Technology License Agreement sets for several express prohibitions on Infosys' ability to use Versata's confidential information.  Section 8(b) of the Agreement defines Versata's confidential information to be all Versata software.  See **Exhibit C, § 8(b)**.  Subsection (c) of Section 8 provides that Infosys may use Versata's confidential information only in connection with the provision of services under the Technology License Agreement.  **Id. at § 8(c)**.  Subsections (d) and (e) are even more specific, and prohibit Infosys from copying, reproducing, disassembling, decompiling, or reverse engineering Versata's confidential information.  **Id. at §§ 8(d) and (e)**.

11.    In addition to agreeing to the express restrictions on its use of Versata's technology, Infosys agreed in the Technology License Agreement that Versata owns all right, title, and interest in all Versata software, including any modifications or derivative works of the same.  See **Exhibit C, § 7(a)**.  Infosys also agreed that Versata owns all inventions, ideas, code, and materials produced by Infosys which are derived from or based on Versata's confidential software and source code.  **Id. at § 7(b)**.

12.    Infosys, acting through its agents and employees, improperly accessed, utilized, copied, disassembled, and decompiled Versata's confidential source code in 2008 and 2009.  In 2008, Infosys was providing software maintenance services for Ameriprise at the same time that

4

Versata provided software services to Ameriprise.  Infosys' agents and employees, working on Versata's code base at Ameriprise, decompiled Versata's DCM source code and created new code for the benefit of Infosys.  More specifically, Infosys decompiled a Versata stock class file and copied some of the code and created a custom class file.  The stock class file was titled "FSTeamValidator.java"   and   was   decompiled   to   a   custom   class   file   titled "FSTeamPartyValidator.java."  Infosys did not have permission or authorization from Versata to access and decompile Versata's confidential source code.

13.     In addition to copying and decompiling the "FSTeamValidator.java" file, Infosys also wrongfully copied and decompiled Versata's "InputSegmentor.java" file at Ameriprise.  An email   was   sent   by   Infosys   employee   Deep   Kulshreshtha   from   the   email   address "Deep_Kulshreshtha@infosys.com" on Mon, Nov 3, 2008 at 4:53 PM to Abhinesh Sikka and others stating that Mr. Kulshreshtha had decompiled InputSegmentor.java.  Mr. Sikka is a software programmer/coder for Versata who worked on the Ameriprise project.  Infosys did not have permission or authorization from Versata to access and decompile Versata's confidential "InputSegmentor.java" file.

14.     In addition to the "FSTeamValidator.java" and "InputSegmentor.java" files, Versata believes that Infosys has wrongfully copied and/or decompiled other confidential Versata software files at Ameriprise, as well as at Boeing, Waddell & Reid, Reynolds and Reynolds, and Mass Mutual.  Because discovery is ongoing, Versata has not yet been able to specifically identify which confidential Versata files have been copied or decompiled by Infosys.

15.     The source code/software files decompiled by Infosys contain the distribution channel management validations and functions.  These validations and functions, as well as the combination of these same validations and functions, qualify as Versata trade secrets.  The

software files decompiled and copied by Infosys contain multiple implementations of validations and functions that are unique and proprietary to Versata.  Each validation and function that is unique or specific to Versata, as well as the software containing the same, is a Versata trade secret.  Further, the source code that contains the combination of Versata-specific validations and functions with other validations specific to Versata's customers are also Versata trade secrets.

16.   Although Versata's proprietary validations exist in tangible form as source code, Versata also contends that the functions performed by these proprietary validations qualify as Versata trade secrets.  All software containing these validations, whether standing alone or in combination with other validations, is confidential and qualifies as a Versata trade secret.

17.   The proprietary validations contained in Versata's software are unique in that prior to Infosys wrongful conduct in decompiling Versata's code, no competitor of Versata offers validations with the same functionality and in the same software code.  The functionality provided by the validations is an integral part of the performance of Versata's distribution channel management software and provides Versata with a competitive advantage over its competitors who do not or cannot provide the same software functionality.

18.   McCamish Systems is an affiliate or subsidiary of Infosys.  McCamish Systems is a competitor of Versata that offers software products and services relating to compensation management that perform or incorporate some of the same functions performed by the Versata software files that were decompiled and copied by Infosys.  McCamish did not begin to market or offer to its customers software products and services relating to the code or functionality found in the Versata software files until after Infosys had wrongfully decompiled and copied Versata's software files.

19.   Infosys has been engaged to provide support and development services around

6

Versata's products at Boeing, Waddell & Reid, Reynolds and Reynolds, and Mass Mutual. Infosys' wrongful copying and decompilation of Versata's confidential code and the creation of new code benefitted Infosys because it enabled Infosys to provide maintenance, support, and development services on Versata's products for these customers. By decompiling Versata's source code and using that information to create new custom code for its own benefit, Infosys not only misappropriated and unfairly used Versata's code, Infosys also learned about the functionalities and capabilities of Versata's code, thereby allowing Infosys to provide the same functionality and capabilities in the code that it developed for Boeing, Waddell & Reid, Reynolds and Reynolds, and Mass Mutual.

20.     In addition, the copying and decompilation of Versata's code and the creation of new code benefitted Infosys because it enabled Infosys to provide development services for Versata's customers. Specifically, by decompiling Versata's validator files and creating new customized class files with the same validation functionality, Infosys was able to provide its customers with a validation functionality that Infosys did not possess. At a minimum, Infosys was able to provide a benefit to its customers without incurring the time and expense of independently developing software code that provided similar functionality.

21.     Infosys's wrongful conduct has had a significant impact on Versata's ability to provide support and development services. Some customers like Reynolds and Reynolds have completely discontinued using Versata for support services and Versata has lost its contracts to provide support services. In other cases, Infosys has performed customer support services that would have been performed by Versata but for Infosys' conduct is misappropriating Versata's confidential source code. As a result, Versata has lost revenue under some contracts even if the contracts themselves are still in place. In the absence of Infosys' conduct in misappropriating

7

Versata's trade secrets, Versata would not have lost the opportunity to continue to provide full support services to the above customers.

22.     Despite its obligations under the various agreements with Versata, Infosys breached these agreements by decompiling Versata's confidential source code. Infosys' conduct also amounts to unfair competition and to misappropriation of Versata's trade secrets.

## V.
## CAUSES OF ACTION

**A.     Declaratory Judgment**

23.     All allegations are incorporated herein by reference for all purposes.

24.     In accordance with F.R.C.P. 57 and 28 U.S.C. § 2201, a justiciable controversy exists between Versata and Infosys regarding Infosys' appropriation and use of Versata's confidential trade secrets and Infosys' failure to comply with its obligations under the agreements with Versata.  Versata, therefore, seeks a judicial declaration that:

(a)     Versata's source code is confidential to Versata and is a trade secret;

(b)     Infosys accessed and decompiled Versata's confidential source code in 2008 and 2009;

(c)     the December 10, 2003 Consultant Agreement, the August 27, 2001 Confidentiality and Nondisclosure Agreement, and the Technology License Agreement are valid and enforceable agreements;

(d)     Infosys did not have permission or authorization to access and decomplile Versata's confidential source code;

(e)     Infosys breached the Consultant Agreement, the Confidentiality and Nondisclosure Agreement, and the Technology License Agreement by accessing and decompiling Versata's confidential source code; and

8

(f)     Infosys wrongfully misappropriated and used Versata's trade secrets by accessing decompiling Versata's source code.

**B.     Breach of Contract**

25.     All allegations are incorporated herein by reference for all purposes.

26.     As set forth above, the Consultant Agreement, the Confidentiality and Nondisclosure Agreement, and the Technology License Agreement set forth express restrictions on Infosys' ability to access, use, and decompile Versata's confidential information. Infosys breached these agreements by decompiling Versata's source code and creating new code for the benefit of Infosys. Infosys also breached these agreements by unfairly performing work that was competitive with Versata using Versata's technology.

27.     Versata, therefore, seeks damages from Infosys in an amount in excess of the jurisdictional limits of this Court for Infosys' breach of the Consultant Agreement, the Confidentiality and Nondisclosure Agreement, and the Technology License Agreement.

28.     Versata has satisfied all conditions precedent to its right to bring this cause of action.

**C.     Misappropriation of Trade Secrets**

29.     All allegations are incorporated herein by reference for all purposes.

30.     As set forth above, Versata's source code is confidential and qualifies as a Versata trade secret because Versata had taken extensive steps to protect the secrecy of the information, including but not limited to maintaining the information in a secure manner and in ensuring that the information is disclosed only to parties bound by confidentiality agreements. Infosys had actual knowledge that this information is confidential and is a Versata trade secret. Nevertheless, Infosys knowingly and willfully misappropriated and used Versata's trade secrets and

confidential information in the development of a product for its benefit.

31.    Versata, therefore, seeks damages from Infosys in an amount in excess of the jurisdictional limits of this Court for the wrongful misappropriation and use of Versata's trade secrets and confidential information.

32.    Versata has satisfied all conditions precedent to its right to bring this cause of action.

**D.    Violation of the Texas Theft Liability Act**

33.    All allegations are incorporated herein by reference for all purposes.

34.    Infosys unlawfully appropriated property and unlawfully used and communicated trade secrets belonging to Versata as prohibited by Texas Penal Code § 31.05.  Pursuant to Texas Civil Practice and Remedies Code § 134.003, Infosys is liable for all damages resulting from these wrongful acts.

35.    Pursuant to § 134.005, Versata shall be awarded court costs and reasonable and necessary attorney's fees.

**E.    Conversion**

36.    All allegations are incorporated herein by reference for all purposes.

37.    As set forth above, Versata's source code files are confidential Versata trade secrets and contain information and functions that qualify as Versata trade secrets.  Infosys had actual knowledge that this information is confidential and qualify Versata trade secrets. Nevertheless, Infosys knowingly and intentionally converted Versata's information for its own use and benefit.

38.    Versata, therefore, seeks damages from Infosys in an amount in excess of the jurisdictional limits of this Court for the conversion of Versata's trade secrets and confidential

10

information.

39.     Versata has satisfied all conditions precedent to its right to bring this cause of action.

**F.      Tortious Interference with Contract**

40.     All allegations are incorporated herein by reference for all purposes.

41.     Versata had or has enforceable agreements with Ameriprise, Boeing, Waddell & Reid, Reynolds & Reynolds, and Mass Mutual to provide software development and maintenance services.  Infosys, however, has tortuously and unjustifiably interfered with Versata's contract and contractual relations by engaging in the tortuous conduct of misappropriating Versata' source code in an effort to steal maintenance, support, and development work from Versata.

42.     Versata, therefore, seeks damages from Infosys in an amount in excess of the jurisdictional limits of this Court for its tortious interference with Versata's contract and contractual relations with Ameriprise, Boeing, Waddell & Reid, Reynolds & Reynolds, and Mass Mutual.

43.     Versata has satisfied all conditions precedent to its right to bring this cause of action.

**G.      Unjust Enrichment**

44.     All allegations are incorporated herein by reference for all purposes.

45.     As set forth above, Versata owns the source code and technologies that Infosys wrongfully misappropriated and used in creating a new class of code for its benefit and in providing maintenance, support, and development services for joint customers.  Infosys, therefore, used Versata's property to obtain benefits for Infosys in the form of revenue from the

11

joint customers.

46.     Versata, therefore, seeks restitution in the form of unjust enrichment for the value

provided to Infosys by the wrongful use of Versata's trade secrets and confidential information.

47.     Versata has satisfied all conditions precedent to its right to bring this cause of

action.

**H.     Constructive Trust**

48.     All allegations are incorporated herein by reference for all purposes.

49.     As set forth above, because Infosys has wrongfully misappropriated and used

Versata's trade secrets and confidential information, Versata is entitled to have a constructive

trust imposed on all technologies and products developed by Infosys using Versata's trade

secrets and confidential information, as well as all benefits and proceeds accruing to Infosys

from the appropriation and use of Versata's trade secrets and confidential information.

**I.     Unfair Competition/Common Law Misappropriation**

50.     All allegations are incorporated herein by reference for all purposes.

51.     Versata created its technology through extensive time, labor, skill, and money.

Infosys' use of that technology in competition with Versata allowed Infosys to gain a special

advantage in that competition, as Infosys is burdened with little or none of the expense incurred

by Versata.  As a result, Versata has suffered commercial damages from Infosys' unfair use of

Versata's technology.

**VI.**
**PUNITIVE DAMAGES**

52.     All allegations are incorporated herein by reference for all purposes.

53.     Infosys acted willfully, maliciously, and grossly negligently by misappropriating

and wrongfully using Versata's trade secrets and confidential information.  Infosys has also acted

12

willfully, maliciously, and grossly negligently by intentionally and tortiously interfering with Versata's agreements with Ameriprise, Boeing, Waddell & Reid, Reynolds and Reynolds, and Mass Mutual. Versata, therefore, is entitled to recover exemplary damages from Infosys.

54.     Versata has satisfied all conditions precedent to its right to bring this cause of action.

## VII.
## ATTORNEYS' FEES

55.     As a result of Infosys' wrongful conduct, Versata has been required to retain the undersigned law firm to prosecute this action. Consequently, in accordance with Sections 37.009 and 38.001 of the Texas Civil Practice and Remedies Code, Versata is entitled to recover its costs and reasonable and necessary attorney's fees from Infosys.

## VIII.
## APPLICATION FOR PRELIMINARY INJUNCTION ORDER

56.     In accordance with F.R.C.P. 65 and the principles of equity, Versata is entitled to injunctive relief and requests a preliminary injunction order from the Court ordering:

(a)     Defendant to cease and desist from in any way using Versata's trade secrets and confidential information relating to Versata's source code; in particular, to cease and desist from using any source code based in whole or in part on Versata's stock class files titled "FSTeamValidator.java" or "InputSegmentor.java;"

(b)     Defendant to cease and desist from any development work on any Infosys products that are based on or incorporate any trade secrets and confidential information relating to the Versata's source code or the proprietary functionality contained in such code;

(c)     Defendant to cease and desist from using any product that is based on or is derived from, in whole or in part, the information that Infosys obtained in decompiling Versata's

source code;

(d)    Defendant to cease and desist from providing software development and maintenance services for Ameriprise, Boeing, Waddell & Reid, Reynolds and Reynolds, and Mass Mutual; and

(e)    Defendant to cease and desist from disclosing or otherwise publishing any of Versata's trade secrets and confidential information.

57.    It is probable that Versata will recover from Defendant after trial on the merits, because Infosys undeniably had knowledge that Versata's source code was confidential and a trade secret, yet Infosys accessed and decompiled Versata's source code to create code for its own benefit.

58.    If Versata's application is not granted, harm is imminent, because Infosys is now using its code based on Versata's confidential source code and is presently benefiting from and will continue to seek to benefit from the wrongful appropriation and use of Versata's trade secrets and confidential information. In addition, because of the difficulty of calculating the damages that have been caused and are being caused to Versata by Infosys' conduct, Versata has and will suffer irreparable harm, and has no adequate remedy at law. Moreover, issuance of an injunction is in the public interest.

59.    Versata asks the court to set its application for preliminary injunction for a hearing, and after hearing the application, issue a preliminary injunction against Infosys.

## IX.
## BOND

60.    Versata is willing and prepared to provide security in an amount this Court deems appropriate in accordance with F.R.C.P. 65.

## X.
## REQUEST FOR PERMANENT INJUNCTION

61.    Versata asks the court to set its request for permanent injunction for a full trial, and after the trial, issue a permanent injunction against Infosys.

## XI.
## CONDITIONS PRECEDENT

62.    All conditions precedent to Versata's right to bring this action have been performed or have occurred.

## XII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Versata prays for the following:

1.    a judicial declaration that:

(a)    Versata's source code is confidential to Versata and is a trade secret;

(b)    Infosys accessed and decompiled Versata's confidential source code in 2008;

(c)    the December 10, 2003 Consultant Agreement, the August 27, 2001 Confidentiality and Nondisclosure Agreement, and the Technology License Agreement are valid and enforceable agreements;

(d)    Infosys did not have permission or authorization to access and decompile Versata's confidential source code;

(e)    Infosys breached the Consultant Agreement, the Confidentiality and Nondisclosure Agreement, and the Technology License Agreement by accessing and decompiling Versata's confidential source code;

(f)    Infosys engaged in unfair competition with Versata by misappropriating and using Versata's trade secrets in competition with Versata; and

(g)    Infosys wrongfully misappropriated and used Versata's trade secrets by accessing

15

decompiling Versata's source code.

2.      an award of damages from Defendant for their misappropriation and use of Versata's trade secrets and confidential information, and for their conversion of Versata's trade secrets and confidential information, and for Defendant's unfair competition;

3.      an award of damages from Infosys for its breach of the agreements with Versata;

4.      an award of damages from Infosys for its tortious interference with the agreements between Versata and Ameriprise;

5.      restitution from Defendant for its misappropriation and use of Versata's trade secrets and confidential information;

6.      an award of prejudgment and post-judgment interest;

7.      an award of Versata's reasonable and necessary costs and attorneys' fees;

8.      an award of exemplary damages from Defendant;

9.      a preliminary injunction order issued ordering:

(a)      Defendant to cease and desist from in any way using Versata's trade secrets and confidential information relating to Versata's source code;

(b)      Defendant to cease and desist from any development work on any Infosys products that are based on or incorporate any trade secrets and confidential information relating to the Versata's source code;

(c)      Defendant to cease and desist from using any product that is based on or is derived from, in whole or in part, the information that Infosys obtained in decompiling Versata's source code;

(d)      Defendant to cease and desist from providing software development and maintenance services for Ameriprise, Boeing, Waddell & Reid, Reynolds and Reynolds, and

Mass Mutual; and

    (e)    Defendant to cease and desist from disclosing or otherwise publishing any of Versata's trade secrets and confidential information.

    10.    a setting for a hearing of Versata's application for preliminary injunction;

    11.    upon hearing of Versata's application for preliminary injunction, a preliminary injunction issued for the injunctive relief as set forth above;

    12.    upon final trial, a permanent injunction issued for the injunctive relief as set forth above; and

    13.    an award of such other and further relief as Versata may show itself to be justly entitled.

Respectfully submitted,

McGINNIS, LOCHRIDGE & KILGORE, L.L.P.
Patton G. Lochridge
SBN 12458500
Travis C. Barton
SBN 00790276
Mark H. Domel
SBN 24003636
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000
(512) 495-6093  Fax
Email: plochridge@mcginnislaw.com
        tcbarton@mcginnislaw.com
        mdomel@mcginnislaw.com


By: _____
        Travis C. Barton
        SBN 00790276

Demetrios Anaipakos
Steven Mitby
Amir Alavi
Ahmad, Zavitsanos & Anaipakos, P.C.
1221 McKinney St., Suite 3460
Houston, Texas  77010-2009
(713) 655-1101
(713) 655-0062 Fax
danaipakos@azalaw.com
smitby@azalaw.com
aalavi@azalaw.com

ATTORNEYS FOR TRILOGY SOFTWARE, INC.
and VERSATA DEVELOPMENT GROUP, INC.,

18

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2011, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

David M. Barkan
Roger S. Borovoy
Fish & Richardson P.C.
500 Arguello St., Suite 500
Redwood City, CA 94063
(650) 839-5070
Fax: 650/839-5071
barkan@fr.com
borovoy@fr.com

*Counsel for Defendant Infosys Technologies Ltd.*

John Michael Gaddis
Martha Deacon Jones
Scott Cashion Thomas
Thomas H. Reger , II
Fish & Richardson P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
214-747-5070
Fax: 214-747-2091
gaddis@fr.com
jones@fr.com
sthomas@fr.com
reger@fr.com

*Counsel for Defendant Infosys Technologies Ltd.*

W. Thomas Jacks
Fish & Richardson P.C.
111 Congress Avenue, Suite 810
Austin, TX 78701
(512) 472-5070
Fax: 512/320-8935
jacks@fr.com

*Counsel for Defendant Infosys Technologies Ltd.*

Travis C. Barton

## VERIFICATION

STATE OF TEXAS                          §
                                        §
COUNTY OF TRAVIS                        §

On this day, Chris Smith appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said that he has read the above Amended Complaint and Verified Application for Injunctive Relief, and that the facts in it are within his personal knowledge and are true and correct.

Chris Smith
Chief Operating Officer,
Versata Software, Inc. and Versata Development Group, Inc.

SWORN TO and SUBSCRIBED before me on the 21st day of July, 2011.

Notary Public in and for the
State of Texas

18

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 57 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 1 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 17 of 45

# TRILOGY

**TRILOGY AND INFOSYS CONFIDENTIAL**

## CONSULTANT AGREEMENT

This Consultant Agreement by and between Trilogy Software, Inc. ("Trilogy") with principal offices at 5001 Plaza on the Lake, Austin, TX 78746 and Infosys Technologies Limited ("Consultant") with principal offices at Electronics City, Hosur Road, Bangalore 560 100, India, dated December 10, 2003 ("Effective Date") sets forth the terms and conditions under which Consultant will provide certain consulting services to Trilogy.

### 1. SCOPE OF SERVICES

1.1 Consultant agrees to provide the professional consulting services ("Services") described on separately executed assignment orders (the "Assignment Order") as may from time to time be issued hereunder.

1.2 Each Assignment Order shall define the specific Services authorized by Trilogy, the schedule or term and the applicable rates and charges. All items prepared or required to be delivered under any Assignment Order (excluding third party items and Consultant IP) are collectively referred to herein as the "Deliverables".

1.3 Each Assignment Order shall be governed by the terms and conditions of this Agreement and in the event of any conflict between this Agreement and an Assignment Order, the provisions of the Assignment Order shall prevail only with regard to the specific Services provided therein, schedule, term, rates and charges associated with the applicable Assignment Order.

1.4 Consultant understands and agrees that by executing this Agreement, Trilogy is not committing or obligating itself to use the services of the Consultant and that no work or charges are or shall be authorized hereunder unless and until authorized in writing by an Assignment Order signed by both parties.

1.5 Affiliates of Trilogy may request Services under this Agreement. Such Services shall require a separately executed Assignment Order between such affiliate and Consultant and the terms and conditions of this Agreement shall govern the Assignment Order.

### 2. TERM

2.1 This Agreement shall remain in effect until terminated by either party as provided herein.

2.2 Each Assignment Order shall remain in effect until the work authorized thereunder is completed, or is earlier terminated as provided herein.

### 3. PRICE AND PAYMENT

3.1 Unless invoicing and payment is tied to milestones specified under a given Assignment Order,

Consultant will invoice Trilogy monthly. All invoices must contain a Trilogy Assignment Order or the invoice will be returned and Consultant must resubmit the invoice with the required information.

3.2 All proper invoices which have been timely submitted shall be paid by Trilogy thirty (30) days from receipt of Consultant's invoice. In the event an invoice does not conform to the Trilogy's correct and accurate time card of the Consultant's employee, the invoice shall be returned to Consultant and Consultant must resubmit the invoice with corrected information. Trilogy shall not be liable to Consultant for payment of incorrect invoices that have been returned to Consultant.

3.3 Consultant shall only invoice Trilogy for time in which Consultant is providing Services. Consultant shall not invoice Trilogy for any other time including, but not limited to, travel, training, internal record keeping, time keeping, non-work related email, or on the job training. In the event that non-billable client time is incurred, such time must be approved by the Project Manager before being paid to Consultant.

3.4 Unless otherwise specified on an Assignment Order, Consultant shall be reimbursed for all reasonable out-of-pocket expenses, specifically authorized in writing by Trilogy, incurred in performance of a given Assignment Order. All expenses must be reported in a line item format, with each separate expense as a line item, on the same invoice as the invoice which reflects the specific Services Consultant was providing when the expense was incurred. Reimbursement of such expenses shall be subject to Trilogy's then current expense reimbursement policy and Consultant shall provide invoices, receipts and other supporting documentation in writing, as Trilogy shall reasonably request for such expenses. Under no circumstances shall reimbursement include travel expenses incurred by Consultant for travel to and from Trilogy offices or H1-B visas, unless specifically authorized in writing by Trilogy or set forth in an Assignment Order.

3.5 Trilogy shall pay or reimburse Consultant for all sales, use, value-added and similar taxes paid or incurred as a result of this Agreement.

### 4. CONFIDENTIALITY

4.1 Consultant agrees to keep confidential all Deliverables and all technical, product, business, financial, and other information regarding the business and software programs of Trilogy (the "Confidential Information"), including but not limited to programming techniques and methods, research and development, computer programs,


EXHIBIT
A

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 58 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 2 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 18 of 45

documentation, marketing plans, customer identity, and business methods. Without limiting the generality of the foregoing, Confidential Information shall include all information and materials disclosed orally or in any other form, regarding Trilogy's software products or software product development, including, but not limited to, the configuration techniques, data classification techniques, user interface, applications programming interfaces, data modeling and management techniques, data structures, and other information of or relating to Trilogy's software products or derived from testing or other use thereof. Confidential Information does not include any information which: (a) is publicly available prior to this Agreement or becomes publicly available other than as a result of Consultant's breach; (b) is rightfully received by Consultant from third parties; (c) is already in Consultant's possession at the time of disclosure; or (d) is independently developed by Consultant without use of the Confidential Information.

4.2    Consultant shall at all times protect and safeguard the Confidential Information and agrees not to disclose, give, transmit or otherwise convey any Confidential Information, in whole or in part, to any other party.

4.3    Consultant further agrees not to attempt to ascertain the source code of any Trilogy computer program by authorized or unauthorized access or review, reverse engineering, decompilation, disassembly, or any other technique or method and to the extent any such activity may be permitted, the results thereof shall be deemed Confidential Information subject to the requirements of this Agreement.

4.4    Consultant agrees that it will not use any Confidential Information for its own purpose or for the benefit of any third party and shall honor the copyrights and other intellectual property rights of Trilogy and will not copy, duplicate, or in any manner reproduce any such copyrighted materials.

4.5    Upon request of Trilogy or upon termination of this Agreement, Consultant shall promptly deliver to Trilogy any and all documents, notes, or other physical embodiments of or reflecting the Confidential Information (including copies thereof) that are in its possession or control. In addition, Consultant agrees to promptly delete all of Trilogy India's Confidential Information from Consultant's computer systems.

4.6    Nothing in this Agreement shall be construed as conveying to Consultant any right, title or interests or copyright in or to any Confidential Information of Trilogy; or to convey any license as to use, sell, exploit, copy or further develop any such Confidential Information.

4.7    The provisions of this Article 4 shall survive for a period of five (5) years following disclosure, notwithstanding any termination or expiration of this Agreement or any Assignment Order hereunder. Confidential Information that constitutes a trade secret under applicable law shall be subject to the provisions of this Article 4 for as long as such Confidential Information qualifies as a trade secret, notwithstanding any termination or expiration of this Agreement or any Assignment Order hereunder. Trilogy shall have the right to take such action it deems necessary to protect its rights hereunder, including, without limitation, injunctive relief and any other remedies as may be available at law or equity.

4.8    Trilogy agrees that information marked in writing or if orally disclosed reduced to writing within a reasonable period of time, or information that is not marked but that a reasonable person under the circumstances would understand to be of a confidential or proprietary nature, (including but not limited to Consultant IP) disclosed by Consultant to Trilogy shall be deemed the confidential and proprietary Information of Consultant. Trilogy shall be subject to the same terms and conditions that Consultant is under with respect to Confidential Information, *Mutatis Mutandis*.

4.9    Subject to prior written approval, this Agreement allows Consultant to include Trilogy's name in a general listing of Consultant's customers; provided that such inclusion will not imply endorsement of Consultant by Trilogy.

4.10   Unless otherwise agreed by Trilogy in writing, during the term of this Agreement and following its expiration or termination, Consultant shall not perform any work that would utilize Trilogy Confidential Information, technology that infringes Trilogy intellectual property, or would involve an inevitable disclosure of Trilogy trade secrets. This restriction shall not apply to Consultant's authorized use of any Trilogy intellectual property that may have been licensed to Consultant pursuant to an arrangement external to this Agreement. Nothing contained in the Agreement shall restrict a party from performing services similar to the services provided by the other party or from using any general ideas, know-how, methodologies, processes or techniques retained in the unaided mental impressions of such party's personnel relating to the Services which either party, individually or jointly, develops or discloses under this Agreement, provided that in doing either of the above, such party does not breach its obligations under this Agreement or infringe the Confidential Information or intellectual property rights of the other party.

5.    OWNERSHIP

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 59 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 3 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 19 of 45

5.1 Trilogy shall own all right, title and interest (including patent rights, copyrights, trade secret rights, trademark rights, *sui generis* database rights and all other rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by Consultant in connection with Services or any Confidential Information (as defined herein) either before or after the Effective Date (collectively, "Inventions") and Consultant will promptly disclose and provide all Inventions to Trilogy. All Inventions are "works made for hire" to the extent allowed by law.

5.2 In the event any Inventions are not deemed "works made for hire," Consultant hereby irrevocably grants, assigns and transfers all right, title and interest of any kind in the Inventions to Trilogy. Consultant shall further assist Trilogy to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights assigned. Consultant hereby irrevocably designates and appoints Trilogy and its agents as attorneys-in-fact to act for and in Consultant's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Consultant.

5.3 Notwithstanding anything to the contrary in this Agreement, Trilogy acknowledges and agrees that all or part of the Services, Deliverables and Inventions may contain general know-how and prior intellectual property of Consultant, which includes but is not limited to utility routines, generalized interfaces, algorithms, ideas, techniques, concepts, proprietary processes, tools, methodologies and improvements to the above (collectively "Consultant IP"). All rights in Consultant IP shall continue to vest exclusively in Consultant. If any part of the Deliverables or Inventions incorporates Consultant IP, Consultant hereby grants Trilogy and its successors a perpetual, irrevocable, worldwide, royalty-free, non-exclusive, sublicensable right and license to make, use, sell, sublicense, reproduce, distribute, perform, display, prepare derivative works from and otherwise exploit all such Consultant IP, solely as part of the Deliverables and Inventions and not separately (unless Consultant has not notified Trilogy in writing of such incorporated Consultant IP prior to incorporation, in which case the preceding license limitation: "solely as part of the Deliverables and Inventions and not separately" shall not apply).

6. FACILITIES

6.1 Trilogy shall provide Consultant's employees and contractors who will be working on-site at Trilogy's facilities with suitable office facilities, including competing resources, required for carrying out Services under this Agreement. To the extent Consultant has access to or uses the facilities or computer resources of Trilogy, Consultant agrees to comply at all times with the applicable rules and regulations regarding safety, security, use, and conduct. In the event Consultant must access Trilogy's proprietary software in order to perform the Services, such access and use shall be governed by a separate, mutually executed Limited Use Agreement between Trilogy and Consultant.

6.2 Unless provided at Trilogy's sole discretion or unless otherwise agreed to in an Assignment Order, Consultant shall provide its own general hardware, software and equipment to provide the Services at Consultant's locations. Should project specific hardware, software or equipment be required, or should hardware, software or equipment be required for use at Trilogy's facilities, it shall be provided at Trilogy's expense, provided it is described on the Applicable Assignment Order.

7. RECORDS AND REPORTS

7.1 Consultant shall maintain complete and accurate records of the work performed hereunder, the amounts invoiced and hours worked (with respect to time-and-materials based assignments only). Such records shall be in accordance with standard accounting practices and shall include, but not be limited to, time sheets and written receipts for reimbursable expenses.

7.2 Copies of the foregoing records and a status report in such detail as Trilogy shall reasonably require shall be furnished to Trilogy at such times and frequencies as Trilogy may request.

7.3 Trilogy shall have the right to inspect and audit Consultant's records at Consultant's place of business during normal business hours at any time during the term of this Agreement and for a period of one (1) year thereafter, upon giving Consultant fifteen (15) days prior written notice.

7.4 Notwithstanding anything to the contrary in this Agreement, Consultant shall not be required to provide internal cost or profit margin information to Trilogy.

8. WARRANTIES OF CONSULTANT

8.1 Consultant warrants that the Services shall be performed in a workmanlike and professional manner.

8.2 Consultant warrants that all employees assigned to perform work under this Agreement shall have a level of skill and experience commensurate with the requirements of the task to which such employee is required to perform. Consultant agrees to promptly

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 60 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 4 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 20 of 45

replace any employee assigned to this Agreement who is not reasonably acceptable to Trilogy.

8.3  Consultant warrants that all Deliverables shall be the original work product of Consultant and will not be based on, or derived from, the proprietary information or items of a third party and that none of the Deliverables will infringe, misappropriate or violate any copyrights, patents, trade secrets, or other proprietary rights of any person or entity (including, without limitation, Trilogy). This warranty shall not extend to any claim of infringement, misappropriation or violation to the extent resulting from (i) Trilogy's detailed specifications; (ii) modification of the Deliverables or Inventions unless made by Consultant; (iii) use or incorporation of the Deliverables and Inventions in a manner for which they were not designed or with items not provided by Consultant

8.4  Unless otherwise set forth in the applicable Assignment Order, Consultant further warrants that for a period of thirty (30) days following delivery, all fixed-price Deliverables shall conform in all material respects with applicable specifications and requirements as set forth in the applicable Assignment Order. Consultant shall correct, at no cost to Trilogy, any breach of the above mentioned warranty. **CONSULTANT DOES NOT WARRANT THAT THE DELIVERABLES WILL BE ERROR OR BUG FREE.**

8.5  The warranty set forth in this Section 8.4 shall not apply to any nonconformance resulting from: (i) use by Trilogy other than according to the documentation (ii) any modifications made by Trilogy or its affiliates, agents and subcontractors; (iii) force majeure, willful acts, fault or negligence of Trilogy or its affiliates, agents and subcontractors; (iv) any breakdown or defective operation arising from Trilogy's electrical and network installation and or the quality of the current supplied or the air-conditioning; or (v) improper maintenance of third party materials (including software and hardware), except where such improper maintenance is due to Consultant's failure with to respect its obligations hereunder.

8.6  Consultant warrants that it will follow all the terms and conditions of Trilogy's then-current Consultant Code of Conduct.

8.7  **THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT ARE THE ONLY WARRANTIES MADE, AND THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, AND SPECIFICALLY THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

9.  **INDEMNITY**

9.1  Consultant will defend at its expense any cause of action brought against Trilogy, its affiliates, subsidiaries, employees, directors, officers, and shareholders (collectively the "Indemnified Party"), to the extent that such cause of action is based on a claim that a Deliverable, Invention or Consultant IP infringes a copyright, patent, trade secret, or other proprietary rights of a third party in United States, India, EU, Australia or Canada. In addition to paying for the defense of such action, Consultant will pay those costs and damages finally awarded against the Indemnified Party pursuant to any such claim, including reasonable attorney's fees and costs incurred by the Indemnified Party. Consultant shall have no liability under this Section unless (i) Trilogy notifies Consultant in writing promptly after Trilogy becomes aware of a claim or the possibility thereof (provided that Consultant's indemnity obligation shall only be relieved to the extent that a delay is materially prejudicial to Consultant's ability to defend); and (ii) Consultant has sole control of the settlement, compromise, negotiation, and defense of any such action; and (iii) Trilogy cooperates, in good faith, in the defense of any such legal action. This indemnity shall not extend to any claim of infringement to the extent resulting from: (i) Trilogy's detailed specifications; (ii) modification of the Deliverables or Inventions unless made by Consultant; (iii) use or incorporation of the Deliverables and Inventions in a manner for which they were not designed or with items not provided by Consultant.

9.2  Consultant agrees to indemnify, defend and hold Trilogy, its affiliates, subsidiaries, employees, directors, officers, and shareholders harmless from any and all claims and threatened claims by any third party, including employees of either party, arising out of, under or in connection with:

(i)  the death or bodily injury of any third party, including any agent, employee, client, business invitee or business visitor of Trilogy or the damage loss or destruction of any tangible personal or real property, strictly to the extent any of the above results from Consultant's acts or omissions; or

(ii)  an act or omission of Consultant in its capacity as an employer of a person and arising out of or relating to: (a) federal, state or other laws or regulations for the protection of persons who are members of a protected class or category of persons (b) sexual discrimination or harassment, (c) work related injury or death, (d) accrued employee benefits and (e) any other aspect of the employment or contractual relationship or its termination (including claims for breach of an express or implied contract of employment) and which, with respect to each of subclauses (a) through (e) arose when the person asserting the claim, demand, charge, action or other proceeding was or purported to be an employee or independent contractor of Consultant.

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 61 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 5 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 21 of 45

9.3     Trilogy will defend at its expense any cause of action brought against Consultant, its affiliates, subsidiaries, employees, directors, officers, and shareholders (collectively the "Consultant Indemnified Party"), to the extent that such cause of action is based on a claim that any software, hardware or specifications (including but not limited to Trilogy software products) provided by Trilogy to Consultant infringes a copyright, United States or Indian patent, trade secret or other proprietary right of a third party in the United States or India. In addition to paying for the defense of such action, Trilogy will pay those costs and damages finally awarded against the Consultant Indemnified Party pursuant to any such claim, including reasonable attorney's fees and costs incurred by the Consultant Indemnified Party. Trilogy shall have no liability under this Section unless (i) Consultant notifies Trilogy in writing promptly after Consultant becomes aware of a claim or the possibility thereof (provided that Trilogy's obligation shall only be relieved to the extent that a delay is materially prejudicial to Trilogy's ability to defend); and (ii) Trilogy has sole control of the settlement, compromise, negotiation, and defense of any such action; and (iii) Consultant cooperates, in good faith, in the defense of any such legal action. This indemnity shall not extend to any claim of infringement to the extent resulting from Consultant's unauthorized use, incorporation or modification of the software, hardware or specifications.

9.4     Trilogy agrees to indemnify, defend and hold Consultant, its affiliates, subsidiaries, employees, directors, officers, and shareholders harmless from any and all claims and threatened claims by any third party, including employees of either party, arising out of, under or in connection with: the death or bodily injury of any third party, including any agent, employee, client, business invitee or business visitor or the damage loss or destruction of any tangible personal or real property, strictly to the extent any of the above results from Trilogy's acts or omissions.

10.     **TERMINATION**

10.1    This Agreement or any Assignment Order hereunder may be terminated prior to expiration or completion in accordance with the following:

(i)     By Trilogy without cause on thirty (30) days written notice. By Consultant without cause on sixty (60) days written notice. However, no such termination shall be effective until all applicable Assignment Orders have been completed. Notwithstanding the preceding sentence, individual Assignment Orders may expressly provide for a termination for convenience option.

(ii)    By either party in the event the other party has failed to perform any obligation required to be performed under this Agreement or an Assignment Order and such failure is not corrected within thirty (30) days from receipt of written notice advising of such failure from the other party.

10.2    Upon completion, termination, or expiration of this Agreement or a given Assignment Order, Consultant shall deliver to Trilogy all copies of all Deliverables in their then current form or state, whether complete or incomplete. In addition, Consultant agrees to promptly delete all of Trilogy India's Confidential Information from Consultant's computer systems.

11.     **INDEPENDENT CONTRACTOR**

11.1    Consultant agrees that it is an independent contractor and that it will perform under this Agreement as an independent contractor. Nothing in this Agreement shall be deemed to make Consultant an agent, employee or partner of Trilogy. Consultant shall not be entitled to any of the fringe benefits of Trilogy and shall have no authority to bind, commit, contract for, or otherwise obligate Trilogy in any manner whatsoever. Furthermore, Consultant shall withhold and pay Social Security, income taxes, and other employment taxes on behalf of itself and its employees.

12.     **LIMITATION OF LIABILITY**

12.1    IN NO EVENT SHALL TRILOGY OR CONSULTANT BE LIABLE ON ANY THEORY OF LIABILITY, WHETHER IN AN EQUITABLE, LEGAL, OR COMMON LAW ACTION ARISING HEREUNDER FOR CONTRACT, STRICT LIABILITY, INDEMNITY, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, FOR DAMAGES WHICH, IN THE AGGREGATE, EXCEED THE AMOUNT TRILOGY HAS PAID UNDER THE ASSIGNMENT ORDER WHICH GAVE RISE TO THE CAUSE OF ACTION. THE PRECEDING SENTENCE SHALL NOT BE INTERPRETED TO LIMIT TRILOGY'S OBLIGATION TO PAY CONSULTANT FOR SERVICES RENDERED AND EXPENSES INCURRED PURSUANT TO AN ASSIGNMENT ORDER, BREACH OF CONFIDENTIALITY OBLIGATIONS HEREUNDER OR EACH PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER.

12.2    EXCEPT FOR BREACH OF CONFIDENTIALITY OBLIGATIONS HEREUNDER, IN NO EVENT SHALL TRILOGY OR CONSULTANT BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE, OR

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 62 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 6 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 22 of 45

CONSEQUENTIAL DAMAGES OF ANY KIND AND HOWEVER CAUSED, INCLUDING BUT NOT LIMITED TO BUSINESS INTERRUPTION OR LOSS OF PROFITS, BUSINESS OPPORTUNITIES, OR GOOD WILL EVEN IF NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGE, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY.

**13.    NONSOLICITATION**

During the term this Agreement is in effect and for a period of six (6) months thereafter, each party agrees not to solicit or to offer employment to any current or former employees (within 6 months of separation) of the other party without the prior written consent of such party. This paragraph shall not apply to solicitations and offers of employment resulting from general employment advertising (including web postings).

**14.    INSURANCE**

14.1    Consultant shall, at its expense, procure and maintain during the term of this Agreement the following insurance: (i) worker's compensation as required by applicable worker's compensation laws; (ii) employer's liability insurance with a limit of not less than $1,000,000 for each accident and $1,000,000 per employee for bodily injury by disease, with a disease policy aggregate of $1,000,000; and (iii) commercial general liability insurance covering all operations of Consultant, including but not limited to products/completed operations with a combined single limit of not less than $1,000,000 per occurrence/ $2,000,000 general aggregate applying per project.

**15.    GENERAL TERMS AND CONDITIONS**

15.1    This Agreement and its Exhibits and Assignment Orders constitute the sole and exclusive statement of the terms and conditions hereof and supersede any prior discussions, writings, and negotiations with respect thereto. Any signed copy of this Agreement made by reliable means (e.g., photocopy or facsimile) shall be considered an original.

15.2    Neither party shall assign or transfer this Agreement or any Assignment Order or subcontract any work required to be performed by it without the prior written consent of the other party, consent not to be unreasonably withheld or delayed. Any attempt to assign or transfer this Agreement shall be void.

15.3    The parties agree that this Agreement cannot be altered, amended or modified, except by a writing signed by an authorized representative of each party.

15.4    Consultant agrees to comply with all applicable laws, regulations, and ordinances relating to its

performance under this Agreement. Trilogy agrees to comply with all applicable laws, regulations, and ordinances relating to its performance under this Agreement or its receipt of the Services.

15.5    The provisions set forth in Sections 4, 5, 7, 8, 9, 10.2, 12, 13, 14 and 15 of this Agreement shall survive termination or expiration of this Agreement and any applicable Assignment Order hereunder.

15.6    Headings are for reference purposes only, have no substantive effect, and shall not enter into the interpretation hereof.

15.7    No failure or delay in enforcing any right or exercising any remedy will be deemed a waiver of any right or remedy.

15.8    If any portion of this Agreement is determined to be or becomes unenforceable or illegal, such portion shall be reformed to the minimum extent necessary in order for this Agreement to remain in effect in accordance with its terms as modified by such reformation.

15.9    Any notice required under this Agreement shall be given in writing and shall be deemed effective upon delivery to the party to whom addressed. All notices shall be sent to the applicable address specified on the first page hereof or to such other address as the parties may designate in writing. Unless otherwise specified, all notices to Trilogy shall be sent to the attention of the Contracts Manager.

15.10    Consultant Trilogy agree to comply with all applicable laws including United States' import/export laws, regulations and ordinances relating to the performance or receipt of Services under this Agreement.

5.11    In the event that either party is unable to perform any of its obligations under this Agreement as a result of natural disasters, actions or decrees of governmental bodies, communication line failures not the fault of the affected party, or any other delay or failure which arises from causes beyond a party's reasonable control (hereafter referred to as a "Force Majeure Event"), the party whose performance has been so affected shall not be liable for such nonperformance but shall promptly give notice to the other party and shall do everything reasonably possible to resume performance.

5.12    THIS AGREEMENT SHALL BE GOVERNED AND INTERPRETED BY THE INTERNAL LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS THEREOF. ANY ACTION OR SUIT RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN AUSTIN, TEXAS.

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 63 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 7 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 23 of 45

TRILOGY AND INFOSYS CONFIDENTIAL

The parties hereto agree to the foregoing as evidenced by their signatures below.

| TRILOGY SOFTWARE, INC. | INFOSYS TECHNOLOGIES LIMITED |
|---|---|
| By: | By: |
| Name: i, Patrick Kelly | Name: Basab Pradhan |
| Title: CFO | Title: Sr. Vice President |
| Date: 2/16/04 | Date: 2/25/04 |

BDS

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 64 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 8 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 24 of 45

# TRILOGY

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

**Effective Date: August 27, 2001**

This Agreement is made between Infosys Technologies Limited ("Company") with offices at Electronics City, Hosur Road, Bangalore 561 229, India

and Trilogy Software, Inc. ("Trilogy"), with offices at 5001 Plaza on the Lake, Austin, TX 78746.

WHEREAS, Company requires access to Trilogy confidential and proprietary information (as defined below) in order to support and develop custom code for Company's client, The Boeing Company (the "Authorized Purpose); and

WHEREAS, Trilogy does not wish to convey any patent, copyright, ownership or other interest therein to Company, or make such Confidential Information public or common knowledge, or permit any use thereof except for the Authorized Purpose; and

NOW, THEREFORE, in consideration of the disclosure of Trilogy's Confidential Information and the Authorized Purpose, it is hereby agreed as follows:

1.   **CONFIDENTIAL INFORMATION.** For purposes of this Agreement, the term "Confidential Information" includes but is not limited to the following:

All Information disclosed by Trilogy to Company or The Boeing Company ("Boeing"), below, on, or after the Effective Date of this Agreement, and generally not publicly known, whether tangible or intangible and in whatever form or medium provided, as well as any information generated by Company that contains, reflects, or is derived from such information. Without limiting the generality of the foregoing, Company acknowledges that the following are proprietary to Trilogy (or its third party licensors), and constitute trade secrets and unpublished copyrighted material of Trilogy (or its third party licensors): Trilogy's software, documentaries and other related materials licensed to The Boeing Company under a separate license agreement; Trilogy's representation methods of modeled data and Trilogy's approach to configuration, including its "constraint-based" approach; and Trilogy's Configuration Modeling Language ("CML"). Confidential Information shall also include any concept, idea, know-how, process, technique, program, design, formula, algorithm or work-in-progress, and any other information regarding Trilogy's software products including, but not limited to, the data classification techniques, user interface, applications programming techniques, data management techniques, data structures, and other information or relating to Trilogy's software products or derived from testing or other use thereof.

Confidential Information does not include any information which (a) is publicly available prior to this Agreement or becomes publicly available without any action on the part of Company; (b) is rightfully received by Company from third parties without accompanying secrecy obligations; (c) is already in Company's possession and was lawfully received from sources other than Trilogy; or (d) is independently developed by Company.

2.   **NON-USE AND NONDISCLOSURE.** Company agrees that Company will not at any time disclose, give or transmit in any manner or form or for any purpose, Trilogy's Confidential Information to any person, party, firm or corporation entity, or use such Confidential Information for its own benefit or the benefit of anyone else, or for any purpose other than the Authorized Purpose. Without limitation of the generality of the foregoing, Company may not use, refer to, or otherwise benefit from Trilogy's Confidential Information in connection with Company's market research, competitive analysis, development, planning, marketing or other business activities.

Company shall take all reasonable measures to preserve the confidentiality and avoid the disclosure of Trilogy's Confidential Information including, but not limited to, those steps taken with respect to Company's own confidential information of like importance.

Company agrees to immediately notify Trilogy of any unauthorized use or disclosure of, or access to, the Confidential Information and shall take all steps reasonably requested by Trilogy to limit, stop or otherwise prevent such loss or unauthorized use, disclosure or access. Such notice shall include a detailed description of the circumstances of the disclosure and the parties involved.

Company agrees to take full responsibility for the actions and/or omissions of its officers and employees under the terms and conditions of this Agreement and any act or omission of an officer of employee of Company shall constitute an act or omission of Company.

3.   **REVERSE ENGINEERING.** In no event shall Company (i) convert the software from a machine-readable form into a human-readable form; (ii) disassemble or decompile the software by using special software to translate machine-dependent object code back into an approximation of the original human-readable machine-independent source code; (iii) examine the machine-readable object code that controls the program's operation and by studying the software's behavior in response to a variety of inputs create an approximation of the original source code; or (iv) perform any other activity related to the software that could be construed to be reverse engineering or is otherwise prohibited by the software license agreement between Boeing and Trilogy. To the extent any such activity may be permitted, the results thereof shall be deemed Confidential Information subject to the requirements of this Agreement.

4.   **NEED TO KNOW BASIS.** Company shall limit its disclosure of Trilogy's Confidential Information to those of its officers and employees to which such disclosure is necessary for the Authorized. In the event the employment or appointment of any such officer or employer is terminated, Company agrees to use best efforts to recover any Confidential Information in such person's custody or control. For the purpose of this Agreement, officers and employees of Company shall not include third party subcontractors of Company.

5.   **RETURN OF CONFIDENTIAL INFORMATION.** Upon Trilogy's reasonable request, or upon termination of the Authorized Purpose, Company shall promptly deliver to Trilogy any and all documents, notes, or other physical embodiments of or reflecting the Confidential Information (including any copies thereof) in Company's possession or control.

At Trilogy's request, a responsible officer of Company shall verify, and provide Trilogy with written certification of, the completeness of the delivery of such materials.

6.   **NONCONVEYANCE.** Nothing in this Agreement shall be construed as conveying to Company any right, title or interests or copyright in or to any Confidential Information of Trilogy; or to convey any license as to use, sell, exploit, copy or further develop any such Confidential Information.

7.   **COURT ORDERED DISCLOSURE.** In the event that Company has been ordered by a valid order of a court or authorized agency of government to disclose all or portions of Trilogy's Confidential Information, Company must promptly notify Trilogy of such order and Company shall cooperate with Trilogy in seeking a protective order and engaging in such other efforts to minimize the disclosure.

8.   **NONCOMPETE.** Company agrees that it will not allow any employee who is working with Trilogy software for the Authorized Purpose to engage in any consulting, employment, development, or to provide any services to or for a competitor of

Rev. 02/2003 ACCT001


EXHIBIT
B

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 65 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 9 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 25 of 45

Trilogy for software products that are substantially similar to and competitive with Trilogy's software products while such employee is engaged in the Authorized Purpose.

9. **NO COMMITMENT.** This Agreement does not in any way bind the parties to enter into a business relationship of any nature with the other. Nothing herein or any other verbal representations made by either party shall be construed as a binding commitment to establish a business relationship. Neither party shall have any liability to the other, except for the breach of this Agreement.

10. **REMEDIES.** Company acknowledges that Trilogy shall have the right to take all reasonable steps to protect its Confidential Information, including, but not limited to, injunctive relief and any other remedies as may be available at law or in equity in the event Company does not fulfill its obligations under this Agreement.

11. **ATTORNEY'S FEES.** In the event any action, including arbitration, is brought to enforce any provision of this Agreement, or to declare a breach of this Agreement, the prevailing party shall be entitled to recover, in addition to any other amounts awarded, reasonable legal and other related costs and expenses, including attorney's fees incurred thereby.

12. **NONASSIGNMENT.** Company may not assign or transfer this Agreement or any rights hereunder to any third party without the prior written consent of Trilogy.

13. **SEVERABILITY AND REFORMATION.** If any portion of this Agreement is determined to be or becomes unenforceable or illegal, such portion shall be reformed to the minimum extent necessary in order for this Agreement to remain in effect in accordance with its terms as modified by such reformation.

14. **RESERVATION OF RIGHTS.** Trilogy reserves all rights not specifically granted herein.

15. **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the parties regarding the subject matter hereof and supercedes all proposals and prior discussions and writings between the parties with respect thereto.

The parties agree that this Agreement may not be altered, amended or modified, except in writing which is signed by an authorized representative of both parties.

All undertakings of this Agreement, shall continue after the termination of the Agreement or the Authorized Purpose.

16. **GOVERNING LAW AND VENUE.** This Agreement shall be construed for all purposes in accordance with the laws of the State of Texas without regard to the conflicts of laws provisions of any state or jurisdiction. Company agrees to the exclusive jurisdiction and venue of the state or federal courts of Travis County, Texas or any other court of competent jurisdiction chosen within Trilogy's sole discretion. Company agrees to waive any objection to the personal jurisdiction of such courts over Company.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the latest date set forth below:

TRILOGY SOFTWARE, INC.

By: _____
    Authorized Signature

By: **Lance A. Jones**
    Name Typed or Printed

**Vice President and General Counsel**        9/10/01
Title                                          Date

INFOSYS TECHNOLOGIES LIMITED

By: _____
    Authorized Signature

By: **Basab Pradhan**
    Name Typed or Printed

**Vice President**        8-30-01
Title                     Date

LEGAL DEPT. APPROVAL

BDS

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 66 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 10 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 26 of 45

# TRILOGY®

TRILOGY CONFIDENTIAL

## TECHNOLOGY LICENSE AGREEMENT

This Technology License Agreement (the "Agreement") entered into as of September 5, 2003 (the "Effective Date") sets forth the terms and conditions under which Trilogy International, Inc., 5001 Plaza on the Lake, Austin, TX 78746 ("Trilogy") will license to Infosys Technology Limited of Electronics City, Hosur Road, Bangalore 560 100, India ("Licensee") certain intellectual property described in Section 2 below (the "Licensed Property") in consideration for Licensee's compliance with this Agreement including payment to Trilogy of all applicable royalties defined herein. Licensee's activities shall be specified on mutually executed orders (the "Assignment Order(s)") as may from time to time be issued hereunder. Each Assignment Order shall define the Licensed Property related services to be provided (the "Services") to the specified Trilogy customer(s), the applicable Technology Royalty (as defined below), and all other appropriate terms and conditions. The first Assignment Order between the parties, "Assignment Order #1," is attached hereto as Attachment A.

Scope of Agreement

Licensee's rights hereunder are limited to providing the Services to the Trilogy customer(s) specified in the applicable Assignment Order (the "Approved Entity").

The foregoing is agreed to by:

TRILOGY INTERNATIONAL, INC.

By: _____

Name: _____ Lance A. Jones _____

Title: Vice President and General Counsel

Date: SEPTEMBER 8, 2003

INFOSYS TECHNOLOGY LIMITED

By: _____

Name: _____ Basab Pradhan _____
                  Sr. Vice President

Title: _____

Date: 9/12/03

Technology License Agreement



EXHIBIT
C

Page 1 of 19

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 67 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 11 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 27 of 45

TRILOGY CONFIDENTIAL

**TERMS and CONDITIONS**

1.   **PROVISION OF SERVICES**

a)   Licensee may only provide Services to Approved Entities upon written approval from Trilogy as stated in a mutually agreed upon Assignment Order.

b)   Licensee may not use subcontractors in the provision of Services described herein and the licenses granted herein are not assignable nor are they sub-licensable to third parties. Notwithstanding the foregoing, Licensee may use subcontractors upon written approval from Trilogy, which will not be unreasonably withheld.

c)   Licensee understands and agrees that it is the choice of the Approved Entity whether to contract with Licensee, Trilogy, or another third party service provider who has a similar relationship with Trilogy.

d)   Each party shall have the sole right to negotiate price and terms and conditions relating to their respective agreements and any other contracts they enter into with an Approved Entity. Neither party has the authority to bind or commit the other party in any manner, or to execute any contract in the name of such other party.

e)   Notwithstanding anything to the contrary in the Agreement or any Assignment Order, Licensee acknowledges that all licenses and rights granted herein are nonexclusive and Trilogy, as well as other Trilogy licensees, should be considered to be direct competitors of Licensee in performing the Services. Should the Approved Entity choose to contract with Licensee, then all agreements for Services will be executed directly between Licensee and the Approved Entity.

f)   Licensee may not express or imply any endorsement by Trilogy of Licensee or its capabilities. If Licensee markets its services to third parties who are not Approved Entities, Licensee may not express or imply any obligation on the part of Trilogy to extend Licensee's rights hereunder to make such unlicensed use of the Trilogy technology.

2.   **LICENSE GRANT AND RIGHT OF USE**

a)   The term "Licensed Patents" shall mean U.S. Patent Numbers 5,515,524 (Lynch et al.), 5,708,798 (Lynch et al.), and 6,002,854 (Lynch et al.) together with any continuations, continuations-in-part, divisionals, reexaminations, reissues, renewals, extensions, and all patents issuing therefrom, and any other patent that claims priority from or through U.S. Patent Numbers 5,515,524, 5,708,798, and 6,002,854.

b)   Trilogy hereby grants to Licensee, subject to the terms of this Agreement, a non-exclusive, nontransferable, nonassignable, worldwide right and license under the Licensed Patents to use the inventions set forth in the Licensed Patents to the extent necessary for Licensee to provide the Services to Approved Entities for which a royalty is paid pursuant to Section 3.

c)   The right and license granted under Section 2(b) shall not apply to any services provided or products made, sold, leased, licensed, or brokered by any third party or by Licensee except as authorized under this Agreement.

d)   Licensee agrees not to challenge the validity or the enforceability of the Licensed Patents in the United States Patent and Trademark Office, or in any proceeding or dispute involving this Agreement, provided that Trilogy has not asserted against Licensee or their successors a claim of infringement of a Licensed Patent, in which event Licensee or their successors reserve all rights and defenses.

e)   Without limiting the right and license grant set forth in Section 2(b), Licensee shall have no right to sublicense rights to the Licensed Patents. Notwithstanding any provision to the contrary, any attempted assignment or transfer of the license grant set forth in Section 2(b) shall be null and void.

f)   The right and license grant set forth in Section 2(b) shall terminate with the expiration date of the last surviving Licensed Patent or upon termination of this Agreement, whichever is earlier.

g)   Except as otherwise provided in this Agreement, this Agreement shall not grant an express or implied license or other rights under any patent or intellectual property owned or controlled by Trilogy other than the Licensed Patents. Nothing contained in this Agreement shall be construed as creating an obligation to

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 68 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 12 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 28 of 45

TRILOGY CONFIDENTIAL

bring or prosecute actions or suits against third parties for infringement of the Licensed Patents, to maintain the Licensed Patents, or to secure additional intellectual property rights relating to the Licensed Patents.

h) Nothing contained in this Agreement shall be construed as: (a) conferring any rights to Licensee to use in advertising, publicity, or other marketing activities any name, trademark, or other designation of Trilogy, including any contraction, abbreviation, or simulation of any of the foregoing, and Licensee agrees not to use the existence of this Agreement in any marketing activity; or (b) creating an obligation to bring or prosecute actions or suits against third parties for infringement, or to secure and/or maintain any of its intellectual property rights except as expressly provided for herein; or (c) limiting the rights that a party has outside the scope of this Agreement.

i) Licensee shall mark in a typeface easily readable by humans at an appropriate location on any material developed by Licensee (provided such development of material is contemplated pursuant to an Assignment Order) that it is subject to the license grant set forth in Section 2(b) the following legend or a legend substantially to the effect of:

"May be licensed under one or more patents, including United States Patent Nos. 5,515,524, 5,708,798, and 6,002,854"

j) Trilogy hereby grants to Licensee, subject to the terms of this Agreement, a non-exclusive, nontransferable, nonassignable right and license to use and access, within the United States of America and India: (i) Trilogy's proprietary Configuration Modeling Language ("CML"); (ii) Trilogy's proprietary Computer Industry Model product in both source code and object code form ("CIM"); and (iii) the Confidential Information (acquired via training or otherwise) associated with CML and the CIM. The permitted use and access of such technology is limited to that which is reasonably necessary for Licensee to provide the Services to Approved Entities for which a royalty is paid pursuant to Section 3. Any work product produced by Licensee which embodies Confidential Information shall be marked as "Trilogy Confidential Information". All use of Confidential Information by Licensee will be subject to terms of Section 8, below.

k) Trilogy reserves all rights and licenses not expressly granted to Licensee pursuant to this Agreement.

l) Notwithstanding anything to the contrary in this Agreement, upon execution of this Agreement Licensee shall be granted the license and access to the Licensed Property in order to provide the Services to the Approved Entities. Licensee shall use commercially reasonable efforts to ensure that within ninety (90) days following the execution of this Agreement its employees utilizing the Licensed Patents are trained and certified in accordance with the requirements of this Agreement.

m) CML and other source code items licensed hereunder may be accessed by Licensee only at Licensee's, Trilogy's and/or the Approved Entities' business locations.

3.   FEES AND PAYMENT

a) Licensee shall pay to Trilogy the royalty fees specified in an Assignment Order for each hour of Services provided to the Approved Entity in which Licensee is actively utilizing the Licensed Property for CML programming (the "Technology Royalty"). Any use of the Licensed Property for any purpose other than CML programming or for training shall be an infringement of Trilogy's intellectual property rights related to the Licensed Property and shall constitute a material breach of this Agreement. Having the Licensed Property loaded on a CPU's fixed storage and/or loaded into RAM without a user accessing the Licensed Property does not constitute "active use" of the Licensed Property. However performing a configuration related service that utilizes CML or is covered by the claims of the Licensed Patents, does constitute "active use" of the Licensed Property. An authorized representative of Licensee shall submit to Trilogy a monthly statement of the hours of Services provided (including a detailed breakdown of which Licensee employees have provided such Services). Accompanying each such submission will be payment for the applicable month's Technology Royalty. Technology Royalties and corresponding invoices shall be due no later than thirty (30) days following the end of the month in which Licensee performed the Services.

b) The authorized representative is defined as a Manager level, single point of contact for all Licensee employees.

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 69 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 13 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 29 of 45

TRILOGY CONFIDENTIAL

c)   Any late Technology Royalty payment shall be subject to any costs of collection (including reasonable legal fees) and shall bear interest at the rate of one and one-half percent (1.5%) per month (prorated for partial periods) or at the maximum rate permitted by law, whichever is less.   Notwithstanding the foregoing, this interest rate shall not apply to any payment received by Trilogy within thirty (30) days of its respective due date.   In addition to other rights and remedies available to Trilogy hereunder and under the law, Trilogy shall have the right to terminate any Assignment Order in the event of Licensee's failure to pay any Technology Royalties within thirty (30) days of the due date.   The Assignment Order will not be reactivated until all amounts due to Trilogy have been paid in full.   Notwithstanding anything to the contrary herein, the parties agree that if Licensee repeatedly fails to make timely payments pursuant to Section 3 a) above, Licensee shall be deemed to be in material breach of this Agreement.

d)   All amounts required to be paid hereunder do not include any amount for taxes or levy (including interest and penalties).   Licensee shall reimburse Trilogy and hold Trilogy harmless for all sales, use, VAT, excise, property or other taxes or levies which Trilogy is required to collect or remit to applicable tax authorities.   This provision does not apply to Trilogy's income, franchise taxes, payroll taxes for Trilogy employees, or any taxes for which Licensee is exempt, provided Licensee has furnished Trilogy with a valid tax exemption certificate.   Trilogy agrees to reasonably cooperate with Licensee in minimizing any tax liability related to this transaction.

e)   All amounts described herein are in United States Dollars.   All amounts shall be billed and paid in United States Dollars.

4.   WARRANTIES

a)   Licensee warrants that it:

   (i)   has the right to enter into this Agreement;

   (ii)   will at all times protect the goodwill of Trilogy;

   (iii)   shall perform the Services in a professional and workmanlike manner;

   (iv)   will assign only employees who have been trained to perform the Services or who are otherwise authorized to perform the Services pursuant to the terms and conditions of this Agreement (unless otherwise agreed by Trilogy in writing)  and will not misrepresent the competency or certification level of those employees assigned to perform the Services;

   (v)   will not enter into any agreement with an Authorized Entity that is inconsistent with the terms of this Agreement;

   (vi)   has not, and will not, make unauthorized use of Trilogy's Confidential Information, the Licensed Patents, CML, and the CIM except in the performance of the Services hereunder; and

   (vii)   will comply with all applicable laws, regulations, and ordinances relating to its performance under this Agreement.

b)   TRILOGY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NONINFRINGEMENT.

5.   RESOURCES AND PERSONNEL

a)   Licensee shall hire and maintain a competent staff that is trained in providing the Services.   Except as otherwise provided in this Agreement, an Assignment Order or as otherwise agreed by Trilogy in writing, only those Licensee employees who have successfully completed the applicable Trilogy training courses and have passed Trilogy's standard certification testing program may perform the Services.   Trilogy may designate the applicable Trilogy training courses and testing programs at Trilogy's reasonable discretion.   Trilogy's current certification levels and training program will be described in the applicable Assignment Order.   Trilogy agrees that prior to participating in Trilogy's training courses Licensee's employees may take the standard certification test in Trilogy's offices in India.   In the event a Licensee employee does not pass the test, Trilogy shall make available to Licensee certain Trilogy training courses in India.   Training

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 70 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 14 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 30 of 45

TRILOGY CONFIDENTIAL

and testing shall be at Licensee's expense. Training materials provided to Licensee employees who attend Trilogy training classes constitute Trilogy Confidential Information and shall be provided to such Licensee employees on a named user license basis. Such training materials may not be shared among Licensee employees and may not be used to train other Licensee employees.

b) Licensee acknowledges that assigning former Trilogy employees to provide Services hereunder may place such employees in a position where they would have difficulty avoiding the disclosure or use of Trilogy trade secrets and technology. Therefore, unless otherwise agreed in an Assignment Order or otherwise in writing, during the term of this Agreement and for one (1) year thereafter, Licensee agrees not to solicit for employment, subcontract with, or in any manner use the services of any employee who is: (i) a current Trilogy employee; or (ii) a former Trilogy employee unless a minimum of six (6) months have lapsed since such former employee's termination date. Unless otherwise agreed in an Assignment Order or otherwise in writing, during the term of this Agreement and for one (1) year thereafter, Trilogy agrees not to solicit for employment, subcontract with, or in any manner use the services of any Licensee employee who has received training pursuant to this Agreement unless a minimum of six (6) months have lapsed since such former employee's termination date. The restrictions on non-solicitation, subcontracting and use of employees set forth in this paragraph shall not apply to general employment advertisements (including web postings).

c) Following the expiration of this Agreement, Licensee shall not perform any competitive work that would utilize Licensed Property, technology that infringes Trilogy intellectual property, or would involve an inevitable disclosure of Trilogy trade secrets. This restriction shall not apply to Licensee's authorized use of any Trilogy intellectual property that may have been licensed to Licensee pursuant to an arrangement external to this Agreement.

d) Licensee agrees to maintain and enforce written agreements reflecting the terms of this Agreement, including but not limited to the non-compete, intellectual property/license and confidentiality provisions herein, with each of Licensee's employees. Licensee shall fully cooperate with Trilogy in any enforcement action against any former employee of Licensee for breach of these terms or infringement of Trilogy's rights. If Licensee's written agreement with employees does not specifically reference this Agreement or the specific technology licensed herein, Licensee shall provide each employee with written notice including such additional, specific information. A copy of the employee notice is attached hereto as Exhibit C.

6. RECORDS AND REPORTS

a) Licensee shall provide Trilogy with written reports on a monthly basis in a form and format similar to the Sample Technology Royalty Report, attached hereto as Exhibit A. Such reports shall, at a minimum, contain information detailing the certification level of Services provided to the Approved Entities for the applicable reporting month as well as year-to-date totals. The accuracy of all reports must be certified by an authorized representative of Licensee. In the event no Services were provided during a reporting month, Licensee must provide a letter to Trilogy stating that no Services were provided and such letter must by signed by an authorized representative of Licensee.

b) Licensee shall keep accurate records and accounts in accordance with standard business practices. Such records shall include, but shall not be limited to, the information required to produce the reports specified hereunder. Trilogy may inspect the portion of Licensee's records that relate to this Agreement on five (5) days notice to Licensee. Such inspection shall be conducted solely for the purpose of verifying Licensee's compliance with the provisions of this Agreement. Trilogy's rights hereunder shall remain in effect through the period ending six (6) months from the expiration or termination of this Agreement. All inspections will be at Licensee's cost unless no material errors or omissions by Licensee are found. In no event shall Licensee be required to provide internal cost, profit or similar information to Trilogy, nor shall Licensee be required to provide any information not directly relevant to Licensee's obligations under this Agreement.

7. OWNERSHIP

a) By signing this Agreement, Licensee irrevocably acknowledges that, except for the rights and licenses granted herein, Licensee has no interest in Trilogy's software, the Licensed Patents, the Confidential

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 71 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 15 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 31 of 45

TRILOGY CONFIDENTIAL

Information, CML, the CIM, or any modifications to or derivative works of any of the foregoing. Trilogy owns and shall own all right, title, and interest in all Trilogy software, Confidential Information, CML, the CIM, and any modifications to or derivative works of any of the foregoing, subject to any limitations associated with intellectual property rights of any third party from which Trilogy has received rights or licenses (the "Third Party Licensors"). Trilogy reserves all rights not specifically granted herein.

b)  Unless otherwise specifically set forth in an Assignment Order, Licensee further agrees that any deliverables, including but not limited to inventions, ideas, code, documents, materials, and technology produced by Licensee which are derived from, based on or use Trilogy's Confidential Information, CML, the CIM, or the Licensed Patents, or any portion thereof (the "Deliverables") shall be owned exclusively by Trilogy or the Approved Entity, depending upon the contractual agreement between Trilogy and the Approved Entity. To the extent that Licensee and the Approved Entity execute an agreement in which the Approved Entity requires full ownership of all Deliverables, Licensee shall include the language set forth in Exhibit D. All rights, title and interest in such Deliverables shall be deemed to have been assigned to Trilogy or the Approved Entity by Licensee upon creation. Licensee agrees to execute any documents and cooperate with Trilogy as necessary for Trilogy to perfect such rights, title, and interest in the Deliverables.

c)  Any reproduction, distribution, or use of Trilogy's domain names, logos, trademarks or trade names (the "Marks") shall be approved in advance by Trilogy. Any such permitted use, advertising, distribution, or reproduction of the Marks shall be solely in connection with Licensee's exercise of its rights hereunder. Upon termination of this Agreement, Licensee shall have no further right to use, advertise, reproduce, or distribute the Marks.

d)  Licensee shall not at any time do, permit, or cause to be done any act or thing that would impair Trilogy's rights in any Trilogy software, Confidential Information, Licensed Patents, CML, the CIM, or the Marks.

8.  CONFIDENTIALITY

a)  "Confidential Information" includes all information disclosed by Trilogy, before or after the Effective Date of this Agreement, which is marked or described (orally or in writing) as being "Confidential" or "Proprietary" to Trilogy (including those items described in Section 8(c) below. Confidential Information also includes that information that would be reasonably considered confidential or proprietary to Trilogy. Confidential Information includes information (i) conveyed in written or graphic form, (ii) disclosed orally, (iii) learned or observed in the course of discussions undertaken between the parties or Licensee's performance of the Services, or (iv) generated by Licensee that contains, reflects, or is derived from Confidential Information.

b)  Confidential Information of Trilogy includes, but is not limited to the following: (i) all Trilogy software including the compiled and uncompiled versions of the CIM and other related materials furnished by Trilogy; (ii) training materials; (iii) Trilogy's representation methods of modeled data; (iv) Trilogy's CML; and (v) Trilogy's approach to configuration, including its "constraint-based" approach. The terms and conditions of this Agreement are also Confidential Information of Trilogy.

c)  Licensee may use Trilogy's Confidential Information only in connection with the provision of Services hereunder.

d)  Nothing in this Agreement shall be construed to convey any interest, title, or ownership rights in any Trilogy software or Confidential Information to Licensee or to any patent, copyright, trademark, or trade secret or grant any other right, title, or ownership interest to the Confidential Information except as may be provided by this Agreement. Except as reasonably required in the performance of its Services pursuant to this Agreement, Licensee agrees not to copy, reproduce, or disclose the Confidential Information to any third party and shall take every reasonable precaution to prevent the theft, disclosure, and the unauthorized copying, reproduction or distribution of the Confidential Information.

e)  Except as otherwise authorized by Trilogy in writing, in no event shall Licensee disassemble, decompile, or reverse engineer the Confidential Information or permit others to do so. Disassembling, decompiling, and reverse engineering include, without limitation: (i) converting the Confidential Information from a machine-readable form into a human-readable form; (ii) disassembling or decompiling the Confidential

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 72 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 16 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 32 of 45

TRILOGY CONFIDENTIAL

Information by using any means or methods to translate machine-dependent or machine-independent object code into the original human-readable source code or any approximation thereof; (iii) examining the machine-readable object code that controls the operation and creating the original source code or any approximation thereof by, for example, studying the behavior in response to a variety of inputs; or (iv) performing any other activity related to the Confidential Information that could be construed to be reverse engineering, disassembling, or decompiling.

f)   Licensee acknowledges that Trilogy and its Third Party Licensors shall have the right to take all reasonable steps to protect its Confidential Information including, but not limited to, injunctive relief and any other remedies as may be available at law or in equity in the event Licensee does not fulfill its obligations under this Section.

g)   Licensee agrees to maintain the confidentiality of Confidential Information and shall use commercially reasonable efforts to confine knowledge of the Confidential Information only to its employees who (i) require such knowledge and use in order to provide the Services hereunder (ii) and who are bound, pursuant to a written agreement, by confidentiality obligations with Licensee which are no less restrictive than those set forth in this Agreement.

h)   Trilogy acknowledges and agrees that information disclosed by Licensee that is clearly marked as "Confidential" shall be treated in confidence by Trilogy in accordance with the same terms and conditions that Licensee is under with respect to Confidential Information pursuant to this Section 8.

i)   Confidential Information does not include any information which: (a) is publicly available prior to this Agreement or is made publicly available by Trilogy without restriction; (b) is rightfully received by Licensee from third parties without accompanying secrecy obligations; (c) is already in Licensee's possession, without an obligation of secrecy, and was lawfully received from sources other than Trilogy; or (d) is independently developed by Licensee without use of the Confidential Information.

9.   TERM AND TERMINATION

a)   This Agreement shall remain in effect for an initial term of eighteen (18) months and shall automatically renew for subsequent annual periods unless terminated in accordance with the following:

   i)   By either party:

      a)   if the other party fails to perform any obligation required of it hereunder and such failure is not cured within thirty (30) days from the date written notice of such failure was given; or

      b)   if the other party files a petition for bankruptcy or insolvency, has an involuntary petition under bankruptcy laws filed against it, commences an action providing for relief under bankruptcy laws, files for the appointment of a receiver, or is adjudicated a bankrupt concern.

   ii)  By Trilogy should Licensee acquire, be acquired by, or merge with, any third party who competes either directly or indirectly with Trilogy

   iii) By Licensee upon thirty (30) days prior written notice.

b)   Upon the termination of an Assignment Order or this Agreement, Licensee must cease performing Services for the Approved Entity under the terms of the terminated Assignment Order or this Agreement. Termination of the Agreement shall immediately terminate all Assignment Orders hereunder.

c)   Within ten (10) days after the expiration or termination of this Agreement (whichever occurs sooner) Licensee shall immediately destroy or return to Trilogy all copies of the Confidential Information, and an officer of Licensee shall provide Trilogy with written certification of the completeness of the destruction or delivery of the Confidential Information.  In addition, within ten (10) days after the expiration or termination of this Agreement (whichever occurs sooner) Licensee shall remove any Trilogy software from Licensee's equipment and return such software and all related materials to Trilogy.

10.  INDEMNIFICATION BY LICENSEE

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 73 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 17 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 33 of 45

TRILOGY CONFIDENTIAL

Licensee shall indemnify and hold Trilogy its employees, agents, affiliates, successors, assigns, representatives, predecessors, and attorneys harmless from and against any claims by an Approved Entity or any other third party arising out of Licensee's errors or negligent omissions in the provision of the Services or breach of this Agreement and claims arising out of Trilogy's termination of any Assignment Order as provided herein; provided that Trilogy's termination is in accordance with terms and conditions of this Agreement. This indemnity shall not extend to any claim to the extent that the claim has directly resulted from Trilogy's acts or omissions.

11. **INFRINGEMENT**

a) Licensee shall report to Trilogy as soon as reasonably possible any threats or claims learned by Licensee that the Licensed Property is or may become the subject of an infringement claim. Should the Licensed Property become, or in Trilogy's opinion is likely to become, the subject of a claim or threat of infringement, Trilogy shall provide Licensee with written notice and immediately upon Licensee's receipt of such notice (the "Infringement Notice Date") from Trilogy, the Licenses granted hereunder shall terminate and Licensee shall cease all use and access to the Licensed Property. EXCEPT AS OTHERWISE SET FORTH IN THIS SECTION 11, TRILOGY SHALL HAVE NO LIABILITY FOR TERMINATING THE LICENSES PURSUANT TO THIS SECTION 11.

b) Trilogy shall indemnify, defend, and hold harmless Licensee its employees, agents, affiliates, successors, assigns, representatives, predecessors, and attorneys (the "Licensee Parties"), at Trilogy's expense, for any cost, loss, damage, liability, judgment, award or expense (including reasonable attorneys fees) related to any claim, action, suit or preceding (each a "Claim"), to the extent that such Claim is based on a claim that the Licensed Property, as delivered by Trilogy to Licensee, infringes a United States copyright, United States patent, or trade secret of a third party. As a part of this indemnity, Trilogy shall pay those costs and damages finally awarded against Licensee Parties pursuant to any such claim or paid in settlement of any such claim if such settlement was approved in advance by Trilogy. Licensee Parties may retain their own counsel at their own expense. Although Trilogy shall have no liability to Licensee Parties for indirect damages suffered by Licensee Parties resulting from an infringement situation covered by this Section 11, the parties agree that Section 12 b) below shall not be interpreted to limit Trilogy's obligation to pay all amounts awarded to a third party for an infringement event requiring indemnification pursuant to this Section 11 even if such award or settlement includes indirect damages.

c) Trilogy shall have no liability under this Section 11 unless:

   i) Licensee Party notifies Trilogy in writing as soon as reasonably possible after the Licensee Party becomes aware of a claim or the possibility thereof, but in each case Trilogy's liability shall be diminished solely to the extent that such delay in notification is prejudicial to Trilogy; and

   ii) Trilogy has sole control of the settlement, compromise, negotiation, and defense of any such action; and

   iii) The Licensee Parties cooperate, in good faith, in the defense of any such legal action.

d) Trilogy shall have no liability for any claim of infringement to the extent based on (i) Licensed Property which has been modified by parties other than Trilogy or as directed or instructed by Trilogy; (ii) Licensee's use of the Licensed Property in conjunction with data where use with such data gave rise to the infringement claim; (iii) Licensee's use of the Licensed Property with non-Trilogy software or hardware, where use with such other software or hardware gave rise to the infringement claim; (iv) Licensee's use of the Licensed Property outside of the scope of this Agreement and/or any applicable Assignment Order (including any use by a Licensee Party who is not licensed under this Agreement). Trilogy shall have no liability for infringement claims based on Licensee's use of the Licensed Property beyond the Infringement Notice Date.

12. **LIMITATION OF LIABILITY**

a) IN NO EVENT SHALL TRILOGY OR TRILOGY'S THIRD PARTY LICENSORS OR LICENSEE BE LIABLE UNDER ANY THEORY OF LIABILITY, WHETHER IN AN EQUITABLE, LEGAL, OR COMMON LAW ACTION ARISING HEREUNDER FOR CONTRACT, STRICT LIABILITY, INDEMNITY, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, FOR DAMAGES WHICH,

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 74 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 18 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 34 of 45

TRILOGY CONFIDENTIAL

IN THE AGGREGATE, EXCEED THE AMOUNT OF THE TECHNOLOGY ROYALTIES PAID BY LICENSEE FOR THE PREVIOUS TWELVE MONTHS AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY. THIS LIMIT OF LIABILITY SHALL NOT LIMIT LICENSEE'S LIABILITY RESULTING FROM SECTIONS 3, 4(A)(IV), 4(A)(V), 4(A)(VI), 4(A)(VII), 7, 8 AND 10. THIS LIMIT OF LIABILITY SHALL NOT LIMIT TRILOGY'S LIABILITY RESULTING FROM SECTION 8 OR 11.

b) IN NO EVENT SHALL TRILOGY OR TRILOGY'S THIRD PARTY LICENSORS OR LICENSEE BE LIABLE UNDER ANY THEORY OF LIABILITY, WHETHER IN AN EQUITABLE, LEGAL, OR COMMON LAW ACTION ARISING HEREUNDER FOR CONTRACT, STRICT LIABILITY, INDEMNITY, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES OF ANY KIND AND HOWEVER CAUSED INCLUDING, BUT NOT LIMITED TO, BUSINESS INTERRUPTION OR LOSS OF PROFITS, BUSINESS OPPORTUNITIES, OR GOODWILL ARISING HEREUNDER EVEN IF NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGE, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY. THIS LIMIT OF LIABILITY SHALL NOT LIMIT LICENSEE'S LIABILITY RESULTING FROM SECTIONS 4(A)(IV), 4(A)(V), 4(A)(VI), 4(A)(VII), 7, 8, AND 10. THIS LIMIT OF LIABILITY SHALL NOT LIMIT TRILOGY'S LIABILITY RESULTING FROM SECTION 8 OR TRILOGY'S OBLIGATION TO PAY THIRD PARTY DAMAGES AS SET FORTH IN SECTION 11(B).

13.  MISCELLANEOUS

a)  Licensee may not assign this Agreement whether by operation of law, change of control, or in any other manner, without the prior written consent of Trilogy. Any assignment or transfer in violation of this Section shall be null and void.

b)  In the event an action, including arbitration, is brought to enforce any provision or declare a breach of this Agreement, the prevailing party shall be entitled to recover, in addition to any other amounts awarded, reasonable legal and other related costs and expenses, including attorney's fees, incurred thereby.

c)  Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled in accordance with the terms and conditions of the Binding Arbitration attachment, attached hereto as Exhibit B.

d)  The provisions set forth in Sections 3, 4(a), 4(b), 5(b), 5(e), 5(d), 6, 7, 8, 10, 11, 12, 13(b), 13(c), 13(d), 13(e), 13(g), 13(h), 13(i), 13(k), 13(l), and 13(n) of this Agreement shall survive termination or expiration of this Agreement and any applicable license hereunder.

e)  Any notice required under this Agreement shall be given in writing and shall be deemed effective upon delivery to the party to whom addressed. All notices shall be sent to the applicable address specified on the face page hereof or to such other address as the parties may designate in writing. Unless otherwise specified, all notices to Trilogy shall be sent to the attention of the Contracts Manager.

f)  Both parties shall remain at all times independent and nothing in this Agreement shall be deemed to create a joint venture, partnership, or agency relationship between the parties. Neither party has the right or authority to assume or to create any obligation or responsibility on behalf of the other.

g)  No failure or delay in enforcing any right or exercising any remedy will be deemed a waiver of any right or remedy.

h)  If any portion of this Agreement is determined to be or becomes unenforceable or illegal, such portion shall be reformed to the minimum extent necessary in order for this Agreement to remain in effect in accordance with its terms as modified by such reformation.

i)  THIS AGREEMENT SHALL BE GOVERNED AND INTERPRETED BY THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS OF ANY STATE OR JURISDICTION. ANY DISPUTE ARISING OUT OF THIS AGREEMENT SHALL BE RESOLVED IN BINDING ARBITRATION AS SET FORTH IN, AND SUBJECT TO, EXHIBIT B.

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 75 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 19 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 35 of 45

TRILOGY CONFIDENTIAL

j)  Licensee may confidentially disclose to Approved Entities the existence of this Agreement and the scope of Licensee's license hereunder, but Licensee may not disclose any financial terms contained herein without the prior written consent of Trilogy's General Counsel, CFO or CEO.

k)  This Agreement includes the accompanying terms and conditions and Assignment Orders, and constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all proposals and prior discussions and writings between the parties with respect thereto. This Agreement cannot be altered, amended, or modified except in a writing that is signed by an authorized representative of each party. Any signed copy of this Agreement made by reliable means (e.g., photocopy or facsimile) shall be considered an original. In the event an Assignment Order includes terms which conflict with this Agreement, the terms of the Assignment Order shall prevail.

l)  Each party acknowledges that should any provision of this Agreement be determined to be void, invalid or otherwise unenforceable by any court of competent jurisdiction, such determination shall not affect the remaining provisions hereof which shall remain in full force and effect.

m)  Licensee shall comply with all then-current export and import laws and regulations of the United States, India and such other governments as are applicable when distributing or using the Licensed Property. Licensee hereby certifies that it will not directly or indirectly export, re-export, transship, or transmit the Software, or any portion thereof, or related information, media, or products in violation of United States and India laws and regulations.

n)  The parties agree that the Agreement shall not be governed by the United Nations Convention on the International Sale of Goods or by UCITA, the application of which is expressly excluded.

# TRILOGY®

TRILOGY CONFIDENTIAL

**Exhibit A**

**SAMPLE TECHNOLOGY ROYALTY REPORT**

Pursuant to Section 6 of the Technology License Agreement between Trilogy International, Inc. and Infosys Technology Limited, the following are Technology Royalties reported for the period _____ through _____



I, _____ [printed name] _____, _____ [title] _____, of _____ [company name] _____, hereby certify that this Technology Royalty Report is true and correct, to the best of my knowledge.

Signature _____

Date _____

*Technology License Agreement*

*Page 11 of 19*

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 77 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 21 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 37 of 45

# TRILOGY®

TRILOGY CONFIDENTIAL

**Exhibit B**

**BINDING ARBITRATION**

1. **General.** If any dispute arises between the parties relating to the Agreement, the parties shall comply with the procedures and conditions set forth in this Exhibit B. However, notwithstanding anything in the Agreement to the contrary, either party may request injunctive or other equitable relief if necessary to prevent irreparable harm pending the outcome of the procedures set forth in this Exhibit B. Furthermore, the parties hereby agree that all payment obligations under this Agreement shall continue throughout any dispute resolution process or litigation.

2. **Arbitration.** Any dispute under the Agreement shall be settled by binding arbitration in Austin, Texas, in accordance with the then-prevailing commercial arbitration rules of the Arbitration Association or any successor organization AAA (the "Rules"), and applying Texas law and/or U.S. federal law, if applicable, without regard to conflicts of laws provisions of any state or jurisdiction. The arbitration shall be held before one (1) arbitrator, selected in accordance with the Rules, who shall be an attorney with reasonable knowledge of the computer software industry. Unless otherwise agreed by the parties, the arbitration shall be conducted in English, and all documents submitted by the parties must be written in English. The arbitrator shall not have the power to alter, modify, amend, add to, or subtract from any term or provision of the Agreement, to rule upon or grant any extension, renewal, or continuance of the Agreement, or to award damages or other remedies expressly prohibited by the Agreement including, without limitation, punitive or exemplary damages. Furthermore, the arbitrator shall allow such discovery as is appropriate and consistent with the purposes of arbitration in accomplishing fair, speedy, and cost effective resolution of disputes. The arbitrator shall reference the rules of evidence of the then-current Federal Rules of Civil Procedure in setting the scope of discovery, except that no requests for admissions shall be permitted and interrogatories shall be limited to (a) identifying persons with knowledge of relevant facts and (b) identifying expert witnesses and obtaining their opinions and the bases therefor. The fees and expenses of the arbitrator shall be shared equally by the parties. Judgment against a party upon the decision rendered by such arbitration may be entered in any court having competent jurisdiction over the party or its assets.

3. **Remaining Actions.** If, as a matter of law, the foregoing arbitration provision is not enforceable as to a particular claim brought by one party against the other, or if a claim is not governed by the procedures in this Exhibit B then that claim shall be instituted solely in a court of competent jurisdiction in Austin, Texas.

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 78 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 22 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 38 of 45

# TRILOGY®

**Exhibit C**

## INTELLECTUAL PROPERTY NOTICE TO EMPLOYEES

Company notice to employees –

Our Company provides CML related services under a patent and intellectual property license from Trilogy Software, Inc. ("Trilogy")  Our right to use CML (including techniques and methods) (the "CML Technology") is limited in scope per the Agreement with Trilogy.  Among the limitations in scope are that users of the CML Technology must be employees of our Company.  Thus, when an employee is no longer employed by our Company, such employee will no longer have a license to use the CML Technology under the Company license.

You should make sure you understand the scope of the license agreement so as to protect the intellectual property of Trilogy.  Furthermore, you should ensure that you do not engage (during or after your employment with our Company) in any activities that would infringe on the exclusive rights of Trilogy or that would cause you to inevitably disclose Trilogy trade secrets.  A copy of the Agreement is available for all employees to review and understand.

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 79 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 23 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 39 of 45

# TRILOGY®

### Exhibit D

### INTELLECTUAL PROPERTY NOTICE TO APPROVED ENTITY

Notwithstanding Company's agreement to assign intellectual property rights in deliverables to Customer, Customer and Company acknowledge that all intellectual property belonging to third party licensors of Company and Customer, including CML related technology belonging to Trilogy Software, Inc. ("Trilogy"), shall remain the property of such third party licensors subject to the license agreements that each party has with such third party licensors. To the extent any deliverable includes or is derived from Trilogy's confidential information, CML, the CIM, or any portion thereof, such deliverable will be subject to the terms of the license agreements in place between Customer and Trilogy.

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 80 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 24 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 40 of 45

# TRILOGY®

TRILOGY CONFIDENTIAL

### Attachment A

### ASSIGNMENT ORDER #1

This Assignment Order is dated September 5th, 2003 and entered into pursuant to the terms of the Technology License Agreement between Trilogy International, Inc. ("Trilogy") and Infosys Technology Limited ("Licensee") dated September 5th, 2003 (the "Agreement").

Trilogy and Licensee agree as follows:

1. **Approved Entities:** Reynolds and Reynolds, Inc.

2. **Definitions**

"Certification Level" means each of the following categories:

   (a) "Associate Engineer" means a Trilogy Certified Modeler who has received a certification test score sufficient to be rated as an "Associate Engineer." Associate Engineers are approved to perform Level 1 Modeling Activities and Level 2 Modeling Activities;

   (b) "Senior Engineer" means a Trilogy Certified Modeler who has received a certification test score sufficient to be rated as a "Senior Engineer." Senior Engineers are approved to perform Level 1 Modeling Activities, Level 2 Modeling Activities, and Level 3 Modeling Activities;

   (c) "Principal Engineer" means a Trilogy Certified Modeler who has taken who has received a certification test score sufficient to be rated as a "Principal Engineer." Principal Engineers are approved to perform Level 1 Modeling Activities, Level 2 Modeling Activities, Level 3 Modeling Activities, and Level 4 Modeling Activities.

"Level 1 Modeling Activities" means CML modeling activities that are limited to updates to the following elements of a CML-based model:

   (a) Component descriptions;

   (b) Class descriptions;

   (c) Simple attribute modifications within an attribute clause of either a component or class definition, limited to the following types of CML attributes: (i) Boolean and Multivalued Boolean; (ii) Date and Multivalued Date; (iii) Float and Multivalued Float; and (iv) String and Multivalued String.

"Level 2 Modeling Activities" means the following CML modeling activities:

   (a) The design, development and modification of CML solutions for storage cards and items of similar complexity;

   (b) The design, development, and modification of CML solutions for product bundles;

   (c) The design, development, and modification of CML-based Wizards, or similar technologies, and simple Wizard logic. Simple Wizard logic explicitly does not include multi-control interdependencies, custom wizard reflection, and custom iteration behaviors.

"Level 3 Modeling Activities" means the following CML modeling activities:

   (a) The design, development and modification of CML solutions for PCs, workstations, small Intel and UNIX –based servers, and small storage products;

   (b) The design, development and modification of a subset of a complex product, such as the implementation of a split-backplane storage shelf;

   (c) The design, development, and modification of complex CML-based Wizards, or similar technologies, and complex Wizard logic.

"Level 4 Modeling Activities" means the following CML modeling activities:

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 81 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 25 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 41 of 45

TRILOGY CONFIDENTIAL

(a) The design, development, and modification of CML solutions for large computer products, such as storage array networks;

(b) The design, development, and modification of architectures of CML-based Wizards, or similar technologies, for complex, multiple computer product solutions, such as the Wizard implementation for clusters;

(c) The design, development, and maintenance of the architecture of an entire CML-model.

"Trilogy Certified Modeler" means a software developer who has taken the Trilogy CML certification exam within the last year, and who has received a score on such exam sufficient to be certified at the Associate Engineer, Senior Engineer, or Principal Engineer level.

3.   **Services**

The Services for which the Trilogy technology licensed herein may be used shall be limited to the following:

(a) Level 1 Modeling Activities only

(b) Services shall only be performed by Trilogy Certified Modelers (except as provide in the "Certification Exception Period" provisions below) and the applicable Technology Royalty must be paid;

(c) Licensee may only represent to an Approved Entity that a particular employee has the skill set commensurate with such employee's Certification Level;

(d) Licensee employees may only perform Services commensurate with their Certification Levels;

(e) Licensee's misrepresentation of any individual's skill set and Certification Level to any third party including the Approved Entity shall constitute a material breach of this Assignment Order and the Agreement;

(f) Only Certified Modeler's or those Licensee employees who are training to become Certified Modelers are licensed to access and use the Licensed Property under the Agreement. Licensee will provide Trilogy with a list of such employees upon request.

4.   **Technology Royalties:**

$15 per hour of work performed on all Modeling Activities

Trilogy does not determine the price charged or the billing arrangement that Licensee may agree to with the Approved Entity. Therefore, the Technology Royalty must be paid for each man-hour during which the Services are performed (irrespective of whether or not such hour of Services constitutes a contractual "billable" hour between Licensee and the Approved Entity or otherwise).

The parties agree that the CIM will not be licensed to Licensee for Services to be performed under this Assignment Order.

5.   **Term**

Unless terminated pursuant to the Agreement, this Assignment Order shall be effective for a period ending four months from the date of this Assignment Order. Notwithstanding anything to the contrary in this Assignment Order or the Agreement, Trilogy may terminate this Assignment Order immediately if and when Reynolds and Reynolds has provided Trilogy with notice that Reynolds and Reynolds will not be purchasing standard Trilogy maintenance and support services for Trilogy's SalesBUILDER software.

6.   **Certification and Training**

- Licensee and Trilogy shall arrange a mutually agreeable time during which certain employees designated by Licensee will take the Trilogy Certification Test for Level 1 Modeling Activities. Any Licensee employees who do not pass the test may arrange to take training from Trilogy as described herein. Trilogy will make its standard training classes available to Licensee as it makes such classes

Case 1:14-cv-00012-SS   Document 1-3   Filed 01/07/14   Page 82 of 102
Case 1:10-cv-00792-SS   Document 29-1   Filed 07/22/11   Page 26 of 26

Case 1:10-cv-00792   Document 1-1   Filed 10/20/10   Page 42 of 45

TRILOGY CONFIDENTIAL

available to its general licensee base. Depending on the situation, Trilogy may be able to provide certain non-standard training access (e.g., after-hours training via videoconference or video tape, self-study procedures, etc.).

- Certification Exception Period: for the term ending ninety (90) days from execution of this Assignment Order, Licensee may perform all Modeling Activities with employees who have not been Certified provided Licensee informs the Approved Entity of such. Licensee shall use reasonable efforts to become certified as soon as practicable.

- For the purpose of this Assignment Order only, the following training fees shall apply:

  - $5,000 per week per instructor (training will range from 1 – 1.5 weeks for Level 1 Certification Training)

  - In addition to the instructor costs, the fee for the licensed training materials and student attendance equals, $300 per attendee.

  - As set forth in the Agreement, training materials are licensed on a named user basis, they may not be copied and they must be returned to Trilogy upon expiration or termination of this Assignment Order.

- The training classes shall be made available in Trilogy's Bangalore India business location.

- In conjunction with the Trilogy training program, Trilogy shall provide training and preparation materials, including any practice exams or workbooks, normally provided to Trilogy certification trainees at least one month prior to the certification testing date for any Licensee employee. Any Licensee employee receiving such materials, however, shall sit for his or her certification exam no later than two months after receiving such materials.

- Any Licensee employee that fails to pass a level of certification training shall be permitted at least one opportunity to retake such certification exam with no requirement to attend any Trilogy training courses.

- Certification testing for Licensee employees will be subject to Trilogy's then current standard testing procedures made generally available to candidates requesting certification.

- Trilogy's Certification procedures will change over time and can be made available to Licensee upon request.

The parties hereto agree to the foregoing as evidenced by their signatures below.

| TRILOGY INTERNATIONAL, INC. | INFOSYS TECHNOLOGIES LIMITED |
|---|---|
| By: | By: |
| Name: Vance A. Jones | Name: Basab Pradhan / Sr. Vice President |
| Title: Vice President and General Counsel | Title: |
| Date: SEPTEMBER 8, 2003 | Date: 9|12|03 |

# EXHIBIT
# D

***CONFIDENTIAL - ATTORNEYS' EYES ONLY***
CHRISTOPHER BRANDON SMITH - November 2, 2012

38 (Pages 274 to 277)

274

1   "Each Assignment Order shall be governed by the terms
2   and conditions of this Agreement, and in the event of
3   any conflict between this Agreement and an Assignment
4   Order, the provisions of the agreement -- of the
5   Assignment Order shall prevail only with regard to the
6   specific services provided therein, schedule, term,
7   rates and charges associated with the applicable
8   Assignment Order." Have I read it correctly thus far?
9       A.  That's correct.
10      Q.  And so -- well, let's go to the 1.4, because it
11  says that. "Consultant understands and agrees that by
12  executing this Agreement, Trilogy is not committing or
13  obligating itself to use the services of the Consultant
14  and that no work or charges are or shall be authorized
15  hereunder unless and until authorized in writing by an
16  Assignment Order signed by both parties." Did I get
17  that part?
18      A.  Yes.
19      Q.  Now, are these same or similar provisions also
20  contained in your consulting agreement with now Versata?
21      A.  It's quite possible. I haven't gone back and
22  matched them up point for point.
23      Q.  Well, if you look at the corresponding numbered
24  paragraphs in your own agreement, the one marked as
25  Exhibit 90.

275

1       A.  Yes, sir.
2       Q.  Do you see that they are, if not exactly worded
3   the same way, are very, very -- for all practical
4   purposes --
5       A.  Similar.
6       Q.  -- similar?
7       A.  Yes, sir.
8       Q.  Okay. Now, I believe you said that, in your
9   own case, if there's not an assignment order, Versata
10  can't pay you for any work you do, true?
11          MR. BARTON:  Objection, form.
12      A.  I said I don't believe they can.
13      Q.  (By Mr. Jacks) Okay. The -- that's your
14  understanding?
15      A.  That's my personal understanding, yes.
16      Q.  Okay. Are you personally aware of any
17  assignment orders that were issued under the consulting
18  agreement between Trilogy and Infosys that is Exhibit
19  109?
20      A.  So I can't say with a hundred percent certainty
21  which agreement. I do know there's a statement of works
22  that existed over the period of time for Infosys. I
23  can't tell you if they tied to this agreement or some
24  other.
25      Q.  Okay. Would it be a true statement that, as

276

1   you sit here today, you can't be sure whether any
2   specific assignment order was entered pursuant to this
3   consulting agreement, and if so, for what work?
4       A.  Well, this would be for Trilogy to hire Infosys
5   to do some work, which would be defined in a statement
6   of work.
7       Q.  Okay.
8       A.  There -- there could be assignment orders
9   associated with this one. I don't recall off the top of
10  my head, back in 2003, which ones those might be, if
11  there are any.
12      Q.  Okay. Now, as of 2003, so far as you know, was
13  Infosys doing any work at Ameriprise related to DCM?
14      A.  I don't know.
15      Q.  Okay.
16      A.  They would probably have a statement of work if
17  they were. Which actually, if I could just make a point
18  there.
19          Are you asking if I knew was Ameriprise --
20  did we hire Infosys to do work at Ameriprise or did
21  Ameriprise hire them?
22      Q.  No, sir, I really didn't ask you that.
23      A.  Okay.
24      Q.  My question is simply whether you know whether
25  or not as of December 2003, Infosys was doing any work

277

1   at Ameriprise relating to DCM software?
2       A.  I understand. I personally don't know.
3       Q.  Okay. As far as you know, was any assignment
4   order ever entered into between Trilogy or its successor
5   companies and Infosys, where the work described in the
6   assignment order under the December 2003 consulting
7   agreement had to do with work at Ameriprise?
8       A.  I'm not personally aware of anything, no.
9       Q.  All right. Are you aware whether Trilogy, or
10  later Versata, ever paid Infosys for work done by
11  Infosys having to do with DCM software at Ameriprise?
12      A.  I'm personally not aware of it.
13      Q.  At your first deposition, you were asked some
14  questions about McCamish. Do you remember that?
15      A.  At a high level. It's been a while.
16      Q.  Since the time of your first deposition in this
17  case on August 31st of last year, 2011, have you
18  undertaken any further investigation, research or
19  activity of any kind involving McCamish?
20      A.  I personally have not looked for any more new
21  data, no.
22      Q.  Have -- as far you're aware, has anyone else at
23  Versata undertaken any other work, investigation,
24  research, related to McCamish?
25          MR. BARTON:  I want to object to that

***CONFIDENTIAL - ATTORNEYS' EYES ONLY***
**CHRISTOPHER BRANDON SMITH - November 2, 2012**

39 (Pages 278 to 281)

278

1   question because it calls for information protected by
2   attorney-client privilege because it may call the
3   witness to disclose attorney-client strategy. If the
4   witness can answer the question without disclosing --
5           THE REPORTER: I'm sorry. You have to
6   speak up a bit.
7           MR. BARTON: Because the question may call
8   for the witness to disclose attorney-client strategy, if
9   the witness can answer the question without disclosing
10  such information, please feel free to do so.
11          MR. JACKS: All right.
12      A.  I'm personally not involved in any research
13  or --
14      Q.  (By Mr. Jacks) Okay. And right now let me put
15  the lawyers aside. I'm not asking you what the lawyers
16  have been doing, if anything.
17      A.  All right.
18      Q.  But are you aware of anyone else at Versata or
19  acting on behalf of Versata who's done any investigation
20  or research or activity of any kind relating to
21  McCamish?
22          MR. BARTON: Object to the question
23  because it seeks information that's protected by the
24  attorney-client privilege, because it asks for
25  information about trial strategy and work that may be

279

1   performed by the direction or at the direction of
2   attorneys. If the witness can answer the question
3   without disclosing strategy information, please do so.
4   But if your answer relates to strategy information, I
5   instruct you not to answer the question. And if you
6   don't know either way, you can tell us you don't know
7   either way.
8       A.  Yeah. I'm not sure I know either way.
9       Q.  (By Mr. Jacks) All right. So far as you know,
10  is Waddell & Reed still using DCM software in its work?
11      A.  So my understanding is there is some components
12  of our software running there. It's not clear to me
13  personally how much longer it will be running, but it's
14  certainly not expanding into other areas that it was
15  originally targeted to go into.
16      Q.  Do -- does Versata have any continuing business
17  relationship, contractual relationship with Waddell &
18  Reed?
19      A.  I imagine we do. They're still running our
20  software, so there's still a license agreement. I don't
21  know personally if it's a maintenance or subscription
22  agreement, but there would be some obligation there from
23  that standpoint.
24      Q.  If I've understood you correctly, Waddell &
25  Reed didn't expand its business relationship with

280

1   Versata in the way that Versata had imagined they
2   might?
3       A.  Well, I don't think I'd say it that way.
4   Waddell & Reed bought the software to do compensation
5   management across a large book of business. We deployed
6   the first component of that, and it stopped there.
7       Q.  What software did they specifically buy?
8       A.  DCM.
9       Q.  Is there something called "Cloud 9"?
10      A.  Cloud 9 was an internal code word, if you will,
11  for the book of business that Scott Brighton ran before
12  he became CEO of Versata. So he would actually -- under
13  Cloud 9, he would run other businesses that we had
14  acquired as part of their strategy of acquiring software
15  companies.
16      Q.  Was Waddell & Reed the first customer who
17  intended to go live after the Cloud 9 transition?
18      A.  I'm not really sure of the time line, but they
19  were -- they were a customer before that, and so I want
20  to say that they were mid to end of deployment as that
21  happened. At least for the first phase.
22      Q.  Were there complaints from Waddell & Reed about
23  problems they had with DCM software?
24      A.  Most likely. That's not uncommon in any
25  deployment.

281

1       Q.  Would you describe them as a happy or unhappy
2   customer?
3       A.  I guess it depends on the period of time you
4   pick.
5       Q.  Well, let's pick the period of time of last
6   year, 2011.
7       A.  They would have been heading towards not so
8   happy for a number of reasons.
9       Q.  Do you have any evidence that the reasons why
10  Waddell & Reed was unhappy have anything to do with
11  Infosys -- well, with Infosys at all?
12      A.  So the question is: Was any of their issues in
13  that be period of time related to Infosys?
14      Q.  Yes, sir.
15      A.  That was one of the issues, yes, that was a
16  major one. They were using Infosys, and we expressed
17  some concerns with how they were using them and couldn't
18  come to agreement on how they could protect our
19  intellectual property, and so they ultimately decided to
20  freeze that deployment and stop using them.
21      Q.  And did that happen, as far as you know?
22      A.  As far as I know, that's happened, yes.
23      Q.  And as far as you know, has that -- did that
24  make the relationship between Versata and Waddell & Reed
25  a happy relationship instead of an unhappy one?

# EXHIBIT
# E-1

# McCAMISH SYSTEMS

## AN INFOSYS COMPANY

**McCamish Systems is now an Infosys company.**
**Click here to read the press release.**
**Visit: www.infosys.com/bpo**

Services
Solutions
Expertise
Advantages
About Us
News
Events
FAQ
White Papers

Home        Contact Us        Site Map                                    PMACS®

Producer Services          Insurance Services                Retirement Services


Exceeding
Your
Expectations

**Highly Functional, User-friendly Interface**

McCamish Systems now offers a single platform to automate your sales force management.

At the base of a successful compensation system is the hierarchy that controls agent authority and compensation payments. No limit exists in the PMACS® application regarding the number of hierarchy levels, and the system provides such structures as alternate payee and third party marketer to help manage other key compensation relationships.

This fully integrated application provides you with the tools you need to:

▶ Add new agents and specify their reporting hierarchies

▶ Automatically pay commissions according to the schedules you set

▶ Manage the producer process, including the renewal of appointments and licenses

**Sales Force Management**

The PMACS® application helps you manage your sales force effectively and process commissions quickly. The system automates the following key producer management processes:

▶ Producer Maintenance: The PMACS® application is designed to support all producer-related activity with the flexibility to match your business practices. The system can support the real world case of multiple active relationships for an agent with separate contracts, compensation structures and processing rules as needed. And, all information can be consolidated at the agent level to provide a more holistic view of a producer across product lines or distribution channels, when appropriate.

▶ Licensing: The PMACS® application supports insurance licensing, appointments, renewals and securities registration. Processing rules and follow-up notices are specific to a jurisdiction or function.

▶ Compensation: The PMACS® application offers flexible compensation paying capability and interfaces with your policy administration systems to automate commissions resulting from sales. A scheduler is available to trigger periodic or irregular commissions.

▶ Reporting: You can schedule reports or create ad-hoc reports by territory, wholesaler, distribution channel, and so forth. The system generates producer information and places it in a central repository, which is available to your entire

organization.

▶ System Administration: Wizard methodology helps you to easily add and update agents and other producers. Users can enter notes to clarify the reasons for entering various types of information. You can review any entry in the audit trail.

**Flexible Design**

The PMACS® application is flexible, multi-tiered and browser-based. It is scalable and data source independent—you can easily retrieve information from the relational database using a J2EE-compliant user interface or a variety of electronic data interface (EDI) options. The user-friendly application is programmed using object-oriented technology.

**✳ ✳ ✳**

For more information about McCamish Systems, please contact our Sales & Marketing group at Solutions@McCamish.com or call 800.366.0819.

▲Top

©2009, McCamish Systems, L.L.C. All rights reserved.

# EXHIBIT
# E-2

INTERNET ARCHIVE    http://www.mccamish.com/pmacs.htm    Go    JUL  OCT  JAN  Close
WaybackMachine    31 captures    ◀  15  ▶    Help
14 Feb 04 - 20 Jan 10    2005  2006  2007



# MCCAMISH SYSTEMS

Home    Contact Us    Site Map    PMACS®

| Producer Services | Insurance Services | Retirement Services |



Services
Solutions
Expertise
Advantages
About Us
News
Events
FAQ
White Papers



Exceeding
Your
Expectations

**Highly Functional, User-friendly Interface**

McCamish Systems now offers a single platform to automate your sales force management.

At the base of a successful compensation system is the hierarchy that controls agent authority and compensation payments. No limit exists in the PMACS® application regarding the number of hierarchy levels, and the system provides such structures as alternate payee and third party marketer to help manage other key compensation relationships.

This fully integrated application provides you with the tools you need to:

▶ Add new agents and specify their reporting hierarchies

▶ Automatically pay commissions according to the schedules you set

▶ Manage the producer process, including the renewal of appointments and licenses

**Sales Force Management**

The PMACS® application helps you manage your sales force effectively and process commissions quickly. The system automates the following key producer management processes:

▶ Producer Maintenance: The PMACS® application is designed to support all producer-related activity with the flexibility to match your business practices. The system can support the real world case of multiple active relationships for an agent with separate contracts, compensation structures and processing rules as needed. And, all information can be consolidated at the agent level to provide a more holistic view of a producer across product lines or distribution channels, when appropriate.

▶ Licensing: The PMACS® application supports insurance licensing, appointments, renewals and securities registration. Processing rules and follow-up notices are specific to a jurisdiction or function.

▶ Compensation: The PMACS® application offers flexible compensation paying capability and interfaces with your policy administration systems to automate commissions resulting from sales. A scheduler is available to trigger periodic or irregular commissions.

▶ Reporting: You can schedule reports or create ad-hoc reports by territory, wholesaler, distribution channel, and so forth. The system generates producer information and places it in a central repository, which is available to your entire organization.

▶ System Administration: Wizard methodology helps you to easily add and update agents and other producers. Users can enter notes to clarify the reasons for entering various types of information. You can review any entry in the audit trail.

**Flexible Design**

The PMACS® application is flexible, multi-tiered and browser-based. It is scalable and data source independent—you can easily retrieve information from the relational database using a J2EE-compliant user interface or a variety of electronic data interface (EDI) options. The user-friendly application is programmed using

object-oriented technology.

**✳ ✳ ✳**

For more information about McCamish Systems, please contact our Sales & Marketing group at Solutions@McCamish.com or call 800.366.0819.

▲Top

©2006, McCamish Systems, L.L.C. All rights reserved.

# EXHIBIT
# F-1

# McCAMISH SYSTEMS

## A N   I N F O S Y S   C O M P A N Y

**McCamish Systems is now an Infosys company.**
**Click here to read the press release.**
**Visit: www.infosys.com/bpo**

Services
Solutions
Expertise
Advantages
About Us
News
Events
FAQ
White Papers

Home      Contact Us      Site Map                                      VPAS® Life

**Producer Services**      **Insurance Services**      **Retirement Services**

*Exceeding Your Expectations*

The VPAS® Life application supports many types of life insurance and annuities products and markets.

**Insurance Products Supported**

▶ Fixed and Variable Universal Life

▶ Traditional Life

▶ Term Life

▶ Fixed and Variable Deferred Annuities

**Life Insurance Markets Supported**

▶ Individual

▶ Corporate Owned (COLI) and Bank Owned

▶ Private Placement

▶ Multiple Carrier and Producer Driven (Virtual Insurance Company

**Annuities Markets Supported**

▶ Non-qualified

▶ Qualified: IRA, Roth, 403(b), etc.

**VPAS® Life Highlights**

▶ Easy product setup and implementation, enabling you to deploy products rapidly, and simultaneously deliver customer satisfaction that exceeds expectations

▶ Reusable business objects, enabling you to design multiple life insurance products with minimal programming and virtually no regression testing

▶ Simple security setup for various levels of users and groups, and dynamic menus that can be configured or removed based on client or region

▶ Detection and recovery of errors in the Daily Events Processor, Reports Processor and the user interface

▶ Policy administration for such functions as new business setup, agent/agency definition, billing, remittance, surrenders, loans, investments, and so forth, compliance testing and undo/redo capability

▶ Generation of standard/custom reports and extracts from import/export interfaces

**\* \* \***

For more information about McCamish Systems, please contact our Sales & Marketing group at Solutions@McCamish.com or call 800.366.0819.

▲Top

©2009, McCamish Systems, L.L.C. All rights reserved.

# EXHIBIT F-2



# MCCAMISH SYSTEMS

Home     Contact Us     Site Map     VPAS® Administration Services

**Producer Services**     **Insurance Services**     **Retirement Services**



Services
Solutions
Expertise
Advantages
About Us
News
Events
FAQ
White Papers

*Exceeding Your Expectations*

The VPAS® Life application supports many types of life insurance and annuities products and markets.

**Insurance Products Supported**

- Fixed and Variable Universal Life
- Traditional Life
- Term Life
- Fixed and Variable Deferred Annuities

**Life Insurance Markets Supported**

- Individual
- Corporate Owned (COLI) and Bank Owned
- Private Placement
- Multiple Carrier and Producer Driven (Virtual Insurance Company)

**Annuities Markets Supported**

- Non-qualified
- Qualified: IRA, Roth, 403(b), etc.

**VPAS® Life Highlights**

- Easy product setup and implementation, enabling you to deploy products rapidly, and simultaneously deliver customer satisfaction that exceeds expectations
- Reusable business objects, enabling you to design multiple life insurance products with minimal programming and virtually no regression testing
- Simple security setup for various levels of users and groups, and dynamic menus that can be configured or removed based on client or region
- Detection and recovery of errors in the Daily Events Processor, Reports Processor and the user interface
- Policy administration for such functions as new business setup, agent/agency definition, billing, remittance, surrenders, loans, investments, and so forth, compliance testing and undo/redo capability
- Generation of standard/custom reports and extracts from import/export interfaces

\*\*\*

For more information about McCamish Systems, please contact our Sales & Marketing group at Solutions@McCamish.com or call 800.366.0819.

▲Top

©2007, McCamish Systems, L.L.C. All rights reserved.

## NO. D-1-GN-12-003588

| | | |
|---|---|---|
| VERSATA SOFTWARE, INC., f/k/a | § | IN THE DISTRICT COURT |
| TRILOGY SOFTWARE, INC., and VERSATA | § | |
| DEVELOPMENT GROUP, INC., f/k/a | § | |
| TRILOGY DEVELOPMENT GROUP, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v | § | TRAVIS COUNTY, TEXAS |
| | § | |
| AMERIPRISE FINANCIAL, INC., | § | |
| AMERIPRISE FINANCIAL SERVICES, INC., | § | |
| AMERICAN ENTERPRISE INVESTMENT | § | |
| SERVICES, INC., | § | |
| | § | |
| Defendants. | § | 53rd JUDICIAL DISTRICT |

## <u>AFFIDAVIT OF TOMMY JACKS</u>

TOMMY JACKS, being first duly sworn by me, the undersigned Notary Public in and for the State of Texas, declared upon his oath and under penalty of perjury as follows:

1.      My name is Tommy Jacks. I am over the age of 18 years, am of sound mind, have never been convicted of a felony or crime of moral turpitude, have personal knowledge of the facts stated herein, and am in all respects competent to make this affidavit.

2.      I represent third party McCamish Systems, L.L.C. ("McCamish") in its response to the Notice of Deposition and Subpoena Duces Tecum served by Plaintiffs Versata Software, Inc. and Versata Development Group, Inc. ("Versata") in the above-captioned matter.

3.      I am also counsel for Infosys Limited ("Infosys"), formerly known as Infosys Technologies Limited, in the related lawsuit filed by Versata against Infosys in the U.S. District Court for the Western District of Texas, Case No. 10-cv-00792-SS.

4.      McCamish Systems is a limited liability company organized under the laws of Georgia and headquartered at 6425 Powers Ferry Road, Atlanta, Georgia 30339. McCamish has no facilities in Texas.

5.     The limited notice given by Versata offers insufficient time for McCamish to prepare a witness on the requested topics and gather the requested documents.  McCamish is not a party to this litigation or to the federal lawsuit between Versata and Infosys, and its key personnel have had no involvement with Ameriprise or with the Versata lawsuits and are unfamiliar with the relevant facts and issues.  Accordingly, more time will be needed to prepare a knowledgeable corporate representative witness than would be the case for a typical deposition.  McCamish is currently attempting to identify a knowledgeable representative, but it does not yet know who that person will be, or whether that person could be available on June 26th.

6.     The deposition subject matter includes highly technical topics such as the features and functions of McCamish's software, and the similarities, if any, between that software and Versata's DCM software.  Accordingly, the McCamish representative needs to be prepared for deposition and defended by counsel who has both a strong technical background in software and computer science, and a thorough familiarity with the facts and issues of the Versata-Infosys and Versata-Ameriprise disputes.

7.     The only attorneys who are involved in working with Infosys and/or McCamish in connection with either this case or the federal court case filed against Infosys by Versata and who possess those qualifications are my colleagues Roger Borovoy and David Barkan, both of whom have represented Infosys throughout the federal lawsuit.  Both have decades of experience litigating software-related issues.  In addition, Mr. Barkan has already deposed Versata's chief technical witness and is thoroughly familiar with issues relating to Versata's DCM software.  However, both Mr. Borovoy and Mr. Barkan are out of the country during the month of June, and cannot prepare or present a witness on the noticed date of June 26th.  They will return in early July, and McCamish will be able to present its witness during the week of July 8th, 2013 or at a later date that is mutually convenient.

8.    Since 2006, Infosys has been engaged by Ameriprise to provide maintenance and customization services around Ameriprise's installation of the Versata Distribution Channel Management (DCM) software.

9.    McCamish Systems, L.L.C. is a subsidiary of Infosys BPO Limited, which acquired McCamish in November 2009.  McCamish has had no involvement with the DCM work performed by Infosys Limited at Ameriprise.

10.   Infosys BPO Limited is a subsidiary of Infosys Limited.  Infosys BPO has had no involvement with the DCM work performed by Infosys Limited at Ameriprise.

11.   It is my understanding, based on discovery in the federal lawsuit, that Versata was aware of the acquisition of McCamish by a subsidiary of Infosys as early as March 2010, and internally discussed its concerns about Infosys as a possible "competitor" at that time.  However, Versata did not formally notify Ameriprise until September 2012 that it considered Ameriprise's employment of Infosys to be a breach of Section 4.8 of the Versata-Ameriprise agreement.

12.   For more than two years, Versata has alleged and insinuated in its federal lawsuit that Infosys misappropriated Versata DCM code from Ameriprise and somehow conveyed that code to McCamish so that McCamish's Producer Management and Compensation System (PMACS) software platform could compete with Versata's DCM product.  During that time, however, Versata has never asked to depose a McCamish witness and has never moved to compel any discovery or to set a hearing on objections lodged by Infosys relating to discovery concerning McCamish.

13.   In the two and a half years since Versata filed its federal lawsuit, it has not sought to add McCamish as a party, and has never moved for any injunctive relief against Infosys or McCamish.  Several months ago, Versata agreed to postpone trial of the federal lawsuit until May 2014.

14.     At my direction, counsel for Infosys in the federal lawsuit have collected, reviewed, and produced well over a million pages of documents, interviewed dozens of Infosys personnel, and presented four witnesses for deposition.  This exhaustive discovery has turned up no evidence that Infosys personnel decompiled any Versata code at Ameriprise more recently than July 2010, no evidence that any decompiling of Versata code took place anywhere other than at Ameriprise, and no evidence that any decompiled code from Ameriprise was used outside of Ameriprise, whether at McCamish or anywhere else.

15.     At my direction, and in an abundance of caution, Infosys and McCamish have investigated whether any personnel from the Ameriprise Infosys team had gone on to work on software code development or maintenance at McCamish.  The investigation revealed that there are no employees who have worked both on the Infosys Ameriprise delivery team and on McCamish's developer team.

16.     At my direction, and in an abundance of caution, Infosys and McCamish management have been instructed to make sure that no employee who worked with DCM at Ameriprise will be allowed to work at McCamish in future.

17.     Over the last two years, as a result of legal threats and pressure from Versata, Ameriprise has gradually reduced and then eliminated Infosys's involvement in its DCM maintenance and customization work.

18.     As of May 1, 2013, Infosys employees are no longer working with the DCM software at Ameriprise.  Infosys employees' login credentials have been revoked by Ameriprise so that they no longer have any access to Versata software code.

19.     Attached hereto as Exhibit "A" is a true and correct copy of the Notice of Deposition and Subpoena Duces Tecum served by Versata on McCamish Systems.

20.     Attached hereto as Exhibit "B" is a true and correct copy of excerpts from the August 31,

2011 deposition testimony of Chris Smith, Versata's CEO and corporate representative, given in the federal lawsuit.

21.     Attached hereto as Exhibit "C" is a true and correct copy of the First Amended Complaint filed by Versata in the federal lawsuit on July 22, 2011, the factual allegations in which were sworn and verified by Chris Smith.

22.     Attached hereto as Exhibit "D" is a true and correct copy of excerpts from the November 2, 2012 deposition testimony of Chris Smith.

23.     Attached hereto as Exhibit "E" is a true and correct copy of McCamish's public web page describing the features of its PMACS software, retrieved on June 4, 2013, as well as a true and correct copy of an archived version of the same web page, obtained from the Internet Archive or "Wayback Machine" at http://archive.org/web/web.php, showing the page as it appeared on October 15, 2006.

24.     Attached hereto as Exhibit "F" is a true and correct copy of McCamish's public web page describing the features of its VPAS Life software application, retrieved on June 4, 2013, as well as a true and correct copy of an archived version of the same web page, obtained from the Internet Archive or "Wayback Machine" at http://archive.org/web/web.php, showing the page as it appeared on February 6, 2007.

25.     I declare under penalty of perjury under the laws of Texas and of the United States of America that the foregoing is true and correct.


June 5, 2013

Tommy Jacks


AFFIDAVIT OF TOMMY JACKS                                                Page 5

VERIFICATION

BEFORE   ME,   THE   UNDERSIGNED   NOTARY   PUBLIC,   personally   appeared

_Tommy Jacks_   , who, after first being duly sworn by me, stated that he has personal

knowledge of the facts set forth above and that they are true and correct.

DEBORAH CRAIG SCHUMANN
Notary Public, State of Texas
My Commission Expires
February 26, 2017

_Deborah Craig Schumann_

NOTARY PUBLIC